LEMMON, Justice.
This is an action for a declaratory judgment filed in juvenile court by the parents of a new born infant whose brain allegedly was severely and irreversibly damaged at birth and who has been in a comatose state since birth, with life sustained only by a mechanical ventilator. The attending neo-natalists and the hospital joined as petitioners, requesting that the juvenile court conduct an evidentiary hearing and declare that the child is in a “continued profound comatose state”, with “no reasonable medical chance of recovery” from that condition, so as to be governed by the provisions of La.R.S. 40:1299.36.1 C.[1]
After appointing an attorney to represent the child and appointing an independent medical expert to render an opinion in the matter, the juvenile court on its own motion ordered that the attorney general and the Department of Health and Human Resources be made respondents.[2] When the district attorney (who had been served with a copy of the petition) intervened and filed exceptions, the juvenile court ordered that that official also be made a respondent.
*1017 After a pretrial conference, but before the date set for the hearing, the juvenile court rendered a judgment which dismissed the suit on the bases that (1) the juvenile court did not have jurisdiction over the subject matter, (2) there was no justiciable issue, so that the court could not grant a declaratory judgment or any other relief, and (3) La.R.S. 40:1299.36.1 C is an unconstitutional intrusion by the Legislature into the powers and functions of the judiciary in violation of La. Const. Art. II, § 2 (1974). Because a statute was declared unconstitutional, the case is before this court under our appellate jurisdiction.[3] La. Const. Art. V, § 5 (1974).

Justiciability

This case presents issues as to the availability and scope of judicial proceedings which seek, on behalf of an incompetent person, to remove life support systems from the incompetent person’s body.[4]
Courts in other jurisdictions have considered whether there is a right to a judicial approval of discontinuation of life support systems by the parents or guardian of a terminally ill or profoundly comatose patient, in the absence of a procedure expressly authorized by the Legislature. In Matter of Quinlan, 70 N.J. 10, 355 A.2d 647 (1976), the court recognized that the right of a comatose patient to discontinue extraordinary medical procedures should not be disregarded simply because the patient cannot assert it. Concluding that the right may be asserted by the family or a guardian on the patient’s behalf, the court declared that the life support system could be withdrawn, without any civil or criminal liability on the part of anyone involved in the decision, when the guardian and family of the patient concurred in the decision and the attending physicians, after consultation with an ethics committee or similar body at the hospital, concluded that there is no reasonable medical possibility that the patient will emerge from the comatose state. The court emphasized that rendition of the declaratory judgment did not imply that a judicial procedure for declaratory relief is necessarily required for the implementation of comparable decisions in the field of medical practice.
The Quinlan decision was based on the incompetent person’s right to privacy, as asserted by an authorized person exercising judgment for and in the interest of the incompetent person. Acknowledging the competing state interest in the preservation of life, the court concluded that the combination of the extremely poor prognosis and the extremely great bodily invasion vindicated the choice that the incompetent person could reasonably be presumed to have made if she were competent to do so.
The court emphasized that the life support system performed only a maintenance function and did not cure or improve the underlying condition, which all medical officers agreed was permanent and irreversible with no realistic possibility of the patient’s returning to any semblance of cognitive or sapient life. Because a person in such condition could not be kept alive against her will (if she had been competent to decide on the removal), the court permitted a decision for removal based on the substituted judgment of the parent or guardian, and the court approved the decision after the underlying facts had been proved in the judicial proceeding.
*1018 Significantly, the court also gave tentative declaratory relief (contingent upon the determination on remand that the underlying facts had not changed) from any civil or criminal liability on the part of any parent, guardian, physician, hospital or other participant. The court reasoned that death resulting from the termination of treatment pursuant to the exercise of the right of privacy, within the factual limitation of that case, was not unlawful, even if the death were regarded as homicide.
In Eichner v. Dillon, 73 A.D.2d 431, 426 N.Y.S.2d 517 (1980), the court recognized that the right to privacy, even in absence of legislation, gives rise to the right of a guardian to apply to the court for authority to have a life support system withdrawn from a comatose patient.[5]
After discussing whether courts should act at all in such a situation and expressing a preference for legislative action (which had not occurred and might not ever happen), the court concluded that the immediate circumstances, as well as the best interest of the patient, the family, the physicians and the entire community, demanded a solution having the sanction of law. The court further concluded that the right of a terminally ill and comatose person to refuse extraordinary means for prolonging life should be accorded equally to competent and incompetent persons, so that the judiciary (in the absence of legislation) must provide the incompetent person with a method by which that right might be exercised.
Finally, the court established a procedure by which any future applicants were to be governed, declaring that the “neutral presence of the law is necessary to weigh ... [relevant] factors, and thus, judicial intervention is required before any life support system can be withdrawn”.[6] 426 N.Y.S. at 550. The court stated:
“Accordingly, we hold that the following procedure shall be applicable to the proposed withdrawal of extraordinary life-sustaining measures from the terminally ill and comatose patient. The physicians attending the patient must first certify that he is terminally ill and in an irreversible, permanent or chronic vegetative coma, and that the prospects of his regaining cognitive brain function are extremely remote. Thereafter, the person to whom such certification is made, whether a member of the patient’s family, someone having a close personal relationship with him, or an official of the hospital itself, may present the prognosis to an appropriate hospital committee. If the hospital has a standing committee for such purposes, composed of at least three physicians, then that committee shall either confirm or reject the prognosis. If the hospital has no such standing committee, then, upon the petition of the person seeking relief, the hospital’s chief administrative officer shall appoint such a committee consisting of no fewer than three physicians with specialties relevant to the patient’s case. Confirmation of the prognosis shall be by a majority of the members of the committee, although lack of unanimity may later be considered by the court.
“Upon confirmation of the prognosis, the person who secured it may commence a proceeding pursuant to article 78 of the Mental Hygiene Law for appointment as the Committee of the incompetent, and for permission to have the life-sustaining measures withdrawn. The Attorney General and the appropriate District Attorney shall be given notice of the proceeding and, if they deem it necessary, shall be afforded an opportunity to have examinations conducted by physicians of their own choosing. Additionally, a guardian *1019 ad litem shall be appointed to assure that the interests of the patient are indeed protected by a neutral and detached party wholly free of self-interest.” 426 N.Y.S. at 550.
In Matter of Spring, 380 Mass. 629, 405 N.E.2d 115 (1980), the court acknowledged the growing number of jurisdictions that recognize a right, cognizable in judicial proceedings, to terminate life support systems. Weighing the state’s interest in the preservation of life against the individual’s constitutional right of privacy, the court concluded that there is a right to judicial relief:
“[Tjhere is something approaching consensus in support of some of the principles elaborated in the [Superintendent of Belchertown State School v. Saikewicz, Mass.Sup.Jud.Ct., 373 Mass. 728, 370 N.E.2d 417 (1977) ] opinion. A person has a strong interest in being free from non-consensual invasion of his bodily integrity and a constitutional right of privacy that may be asserted to prevent unwanted infringements of bodily integrity. Thus a competent person has a general right to refuse medical treatment in appropriate circumstances, to be determined by balancing the individual interest against counterveiling State interests, particularly the State interest in the preservation of life. In striking that balance account is to be taken of the prognosis and of the magnitude of the proposed invasion. The same right is also extended to an incompetent person, to be exercised through a ‘substituted judgment’ on his behalf. The decision should be that which would be made by the incompetent person, if he were competent, taking into account his actual interests and preferences and also his present and future incompetency.” 405 N.E.2d at 119.
In discussing the more controversial issue of the procedure to be used in such cases, the court disapproved “shifting of the ultimate decision-making responsibility away from the duly established courts of proper jurisdiction”. The court, although expressly refusing to establish a requirement of prior judicial approval, specifically approved of the guardian’s action in seeking explicit judicial approval for the proposed course of treatment in that case, since the governing law and its application to the situation were in serious doubt. The court further noted that private medical decisions in any area of practice must be made responsibly and are subject to judicial review, if good faith or due care is brought into question.
In Louisiana, the Legislature has not yet established a procedure for parents, tutors or curators of an incompetent person to withdraw life support systems when the person has entered a permanent and irreversible comatose condition. However, the Legislature in Act 339 of 1982 has at least indirectly recognized the incompetent person’s right to have such systems terminated.
Title 40 of the Revised Statutes pertains to Public Health and Safety. Sections 1299.36.1 through 1299.36.3, enacted by Act 339 of 1982 and effective on September 10, 1982, comprise Part XIX of Chapter 5, which is entitled Miscellaneous Health Provisions.
The purpose of Act 339 of 1982 (according to its title) was to provide with respect to nutritional and medical deprivation of an infant with the intent to cause or allow death, to provide for procedures when parental consent for necessary care and treatment is refused, and to provide with respect to judicial proceedings to enforce the provisions of the act.
Subsection A of Section 1299.36.1 prohibits denial or deprivation of food, water or oxygen to an infant with the intent to cause or allow death for any reason.[7] Subsection B likewise prohibits the denial or deprivation of medical or surgical care necessary to attempt to save the life of an infant child, even when the quality of the child’s life will be deficient (apparently because of physical or mental disability) if the child lives.
*1020 Subsection C, quoted in footnote 1, provides an exception to the general rule stated in Subsections A & B.[8] The exception excludes operation of the prohibitory rules when the child’s parents and physicians discontinue use of life support systems and other medical treatment of a child in a profound comatose condition if there is no reasonable medical possibility of recovery.
In the present case the juvenile court concluded that while Subsection C gives the parent the right to make a decision, based on competent medical judgment, to .discontinue treatment or support systems, there is no prohibition or mandate in Subsection C for the court to enforce under the authority of Section 1299.36.3 A.[9] We conclude that the juvenile court erred in this respect.
The Legislature, in enacting the pertinent statute, recognized the right of a permanently comatose child to have his parents and physicians discontinue artificially sustained life under certain conditions. Indeed, the fact that the Legislature set forth in detail the specific conditions under which the right may be exercised reinforces our conclusion that the Legislature intended to recognize the child’s independent right.
Once it has been determined that the child’s right exists in this state, it would be unreasonable to deny the parents and physicians, who are justifiably concerned about the responsibilities arising from the exercise of this awesome right on behalf of the child, the opportunity for a judicial determination that the conditions outlined in the statute do exist as a matter of fact. The parents and physicians should not be required to act at their peril and then to be subject to the legal consequences if a court were to determine subsequently that the conditions necessary to warrant their action did not in fact exist.
We therefore conclude that a permanently comatose child has an independent right to discontinuance of artificially sustained life through the mechanical invasion of the child’s body and that an appropriate representative may judicially assert that right on behalf of the child, either after the event in civil or criminal proceedings or before the event in a declaratory judgment action. In a declaratory judgment action, the primary role of the court should be to determine whether the appropriate safeguards have been provided and the necessary underlying conditions have been proved.
In the present ease, the asserted interest of the child and the intended consequence of death is adverse to the state’s interest in preserving life. The child’s interest is protected by the appointment of an attorney, by the appointment of an independent physician, by the joinder of the attorney general and the local district attorney, and by procedural due process which requires proof of the underlying facts by at least clear and convincing evidence.
Inasmuch as the instant action presents an immediate and genuine situation in which the rights of the parties are uncertain, the parties are entitled to a judgment which will remove the uncertainty, and an appropriate court of record acting within its jurisdiction may render a declaratory judgment in this matter.[10]

*1021
Jurisdiction

The juvenile judge declined jurisdiction, noting that while Section 1299.36.3 (quoted in footnote 9) confers jurisdiction upon the juvenile court in proceedings “to enforce the provisions of this Part” (referring to Part XIX, as adopted by Act 339 of 1982), there was no mandate or prohibition before the court “to enforce” in the instant proceedings. We conclude that the juvenile judge’s interpretation of the legislative conferring of jurisdiction was too restrictive.
Juvenile courts shall have jurisdiction as provided by law. La. Const. Art. V, § 18 (1974). In adopting Act 339 of 1982, the Legislature arguably intended to vest the juvenile courts with at least concurrent jurisdiction over proceedings arising under Part XIX. Section 1299.36.3 A may reasonably be construed to apply to judicial proceedings pertaining to rights granted or recognized by the Part. Since Part XIX recognizes the right of the permanently comatose child to have his parents and physician discontinue medical treatment or life support systems under specified circumstances, the juvenile court has jurisdiction to adjudicate proceedings involving the exercise of this right.[11]
Moreover, juvenile courts have jurisdiction to adjudicate an action for a declaratory judgment. La.C.J.P. Art. 24(2); La.C.C.P. Art. 1871.

Constitutionality

The juvenile court held that La.R.S. 40:1299.36.1 C is unconstitutional. Reasoning that the statute reflects a legislative intent to relieve the court of capacity to act under the described circumstances and to vest the prerogative in the parents based on competent medical judgment without the need for or right to court authorization, the court concluded that Section 1299.36.1 C is an unconstitutional legislative intrusion into the judicial function.[12]
In an earlier section of this decision, we held that an appropriate court has the power and authority to render a declaratory judgment in this matter. That holding vitiates the juvenile judge’s reasoning that the Legislature precluded the courts from rendering decisions or even finding facts in cases relating to removal of life support systems. We conclude that the juvenile court erred in declaring La.R.S. 40:1299.36.1 C unconstitutional on the basis of this mistaken reasoning.
*1022 Finally, we observe that La. Const. Art. I, § 20 provides that “[n]o law shall subject any person to euthanasia...."[13]
Modern medical science has developed procedures and devices which assist, supplement and even replace basic bodily functions. Perhaps as a side effect, there are now methods of prolonging or sustaining life when a person’s vital processes have irreversibly ceased to function spontaneously. In this perspective, we note a vast difference between a person whose quality of life has been significantly decreased by a devastating illness or injury and a person whose comatose body has been significantly (and perhaps unwarrantedly) invaded by machines which cannot cure or improve, but can only artificially prolong an existence that will never be known by the patient. These extraordinary means of preserving a person’s “existence” in an irreversible vegetative coma have little to do with the continuation or the ending of “life”, and removal of such systems under highly restricted circumstances cannot reasonably be construed as violative of the constitutional prohibition against euthanasia. Indeed, the law under review is a warranted exception to the prohibitory rules in Part XIX which were designed to implement the constitutional prohibition against euthanasia when the child is unwanted or the quality of his life will be substantially diminished.
Finally, the same section of the constitution prohibits subjecting any person to torture and. arguably justifies the legislative exception in Part XIX.

Decree

The judgment of the juvenile court is reversed, and the case is remanded to the juvenile court for further proceedings.
DENNIS, J., concurs with reasons.

. La.R.S. 40:1299.36.1 C provides:
“Nothing in this Section shall be interpreted to prevent a child’s parents and physician from discontinuing the use of life support systems or other medical treatment for a child in a continual profound comatose state where, in the opinion of the child’s physician exercising competent medical judgment, the child has no reasonable chance of recovery from said comatose state despite every appropriate medical treatment to correct such condition.”

. The juvenile court took this action on the basis of the “traditional role of the State in protecting life”.

. Arguably, once the juvenile court declined jurisdiction, it had no power and authority to declare the statute unconstitutional or to render any other decree in the case. Nevertheless, this court ultimately has either appellate or supervisory jurisdiction, and we therefore proceed to review all of the grounds on which the juvenile court dismissed the action.

. Although the facts of the present case have not been determined because of the juvenile court’s pretrial disposition, the affidavit of one of the attending physicians asserted that the child’s profound comatose condition is evidenced by abnormal electroencephalography: failure of head growth; abnormal cranial ultrasound, indicating progressive cerebral atrophy; spastic quadriplegia, including inappropriate response to stimuli; inability to suck and feed except by tube feedings; inability to breathe, necessitating an infant ventilator, heart rate dependent on ventilator therapy; and absence of other appropriate signs of consciousness to indicate spontaneous response to environmental or social stimuli.

. The incompetent person in Eichner was an 83-year old member of a religious order who had been in a permanent vegetative coma for many months after suffering cardiac arrest during the surgical repair of a hernia. The patient . had previously expressed his desire that life support systems be discontinued if he were ever involved in such a situation.

. The court also declared that when the procedure is followed, no medical or lay participant shall be subject to criminal or civil liability as a result of the termination of life sustaining measures.

. The last paragraph of Subsection A emphasizes that “[n]o infant child shall be intentionally killed by any other means by any person for any reason”.

. Subsection D provides that potentially lifesaving medical and surgical care is not required to be provided when the potential risks to the child’s 'life or health inherent in the treatment outweigh the treatment’s potential benefits for survival.

. La.R.S. 40:1299.36.3 A, the jurisdictional section of Part XIX, provides:
“Judicial proceedings to enforce the provisions of this Part may be instituted by any agency, institution, or person interested in the child’s welfare in the juvenile court in the jurisdiction where the child is found. All such proceedings shall be heard in confidence without delay, including the holding of special sessions of court. Any appeal or application for writs in any appellate court in cases arising from this Section shall be heard and decided in the shortest possible time. An attorney shall be appointed to represent the child in all trial and appellate proceedings.”

.The very purpose of the declaratory judgment procedure is to remove uncertainty in existing (as opposed to hypothetical) situations. While courts should not render advisory opinions, a person is entitled to relief by declaratory judgment when his rights are uncertain or dis *1021 puted in an immediate and genuine situation and the declaratory judgment will remove the uncertainty or terminate the dispute. When a declaratory judgment is thus appropriate, neither the existence of another adequate remedy nor the fact that further relief has been or can be claimed will preclude the court from rendering a judgment declaring the petitioner’s rights or status. La.C.C.P. Art. 1871.

. If the child’s parents and physicians had announced that they were going to discontinue the life support systems and an agency or person interested in the child’s welfare had filed an injunction asserting that the child had a reasonable chance of recovery from the comatose condition, the juvenile court would have jurisdiction over the subject matter under the clear provisions of the statute. The instant proceeding presents essentially the same issue.

. The judge was justifiably concerned about the right of a juvenile court (or any court) to insulate the child’s parents and physicians from criminal liability arising from removal of life support systems. La.R.S. 40:1299.36.3 B expressly provides that “[n]othing in this Part shall diminish the application of the Louisiana Criminal Code where appropriate”. (Emphasis supplied.)
Arguably, a court should not rule on a person’s prospective criminal liability for contemplated action. Nevertheless, when the Legislature has excluded a precise situation (sought to be declared as existing in this case) from the prohibition against deprivation of medical treatment, and when the attorney general and district attorneys have been made parties to the particular proceeding, the parents and physicians who honestly and in good faith seeks a judicial declaration in advance of the occurrence substantially decrease the likelihood of subsequent criminal prosecution. Moreover, the Spring decision notes that “no prosecutor has proceeded to trial in a case where a physician chose to terminate life-preserving treatment or omit emergency treatment in a hopeless case. See Collester, Death, Dying and the Law: A Prosecutorial View of the Quinlan Case, 30 Rutgers L.Rev. 304, 310-311 (1977).”

. Euthanasia is defined as the act or practice of painlessly putting to death persons suffering from incurable conditions or diseases. Webster’s Third New International Dictionary (1971).