[No. 49101–1.   En Banc.   November 1, 1984.]

*In the Matter of the Guardianship of* JOSEPH
HAMLIN, FOUNDATION FOR THE HANDICAPPED,
*Appellant,* HARBORVIEW MEDICAL CENTER,
ET AL, *Respondents,* SALLY PASETTE,
*as Guardian ad Litem, Petitioner.*

*Bogle & Gates* and *Robert A. Stewart,* for appellant.

*Kenneth O. Eikenberry, Attorney General, James B. Wilson, Senior Assistant,* and *Steve Milam, Assistant,* for respondent Harborview Medical Center.

*Norm Maleng, Prosecuting Attorney,* and *Fred A. Kaseburg* and *Stephen Sewell, Deputies,* for respondent King County.

*Sally Pasette,* as guardian ad litem.

BRACHTENBACH, J.—The main issue is a determination of

who, if anyone, has authority to authorize the withdrawal of life support systems when (1) the patient has only minimal brainstem activity and (2) the patient has been severely mentally retarded since birth, therefore, never expressing his wishes about termination of life support.

While this case was on appeal, Joseph Hamlin, the patient/ward, died. Because the issues presented clearly met our criteria for deciding moot cases, we retained the matter for decision. *Sorenson v. Bellingham,* 80 Wn.2d 547, 558, 496 P.2d 512 (1972).

While Joseph Hamlin is now deceased, we mention the facts of his condition to give perspective to the problems facing doctors, hospitals, courts, families and guardians as they attempt to resolve the issues in cases of this nature.

Hamlin, blind and severely retarded since birth, was 42 years old when admitted to Harborview Medical Center (hereinafter Hospital) on June 15, 1982, for treatment of severe pneumonia and hypoxemia. On June 25, 1982, the Hospital filed a petition in superior court seeking appoint-ment of a guardian for Hamlin because "[the patient was] critically ill and . . . [was] incapable of understanding his illness or intelligently consenting to care." The court appointed attorney Sally Pasette as guardian ad litem. After her investigation, the Foundation for the Handi-capped (hereinafter Foundation) agreed to accept guard-ianship of Hamlin. The Foundation was appointed guardian; the guardian ad litem was discharged.

Hamlin's mental age had been assessed at approximately 1 year. His self–help age was assessed at 1.2 years and his I.Q. was estimated to be between 6 and 13. He was able to feed himself with a spoon and drink from a glass; he could indicate his general wants and demonstrate pleasure and displeasure.

After admission to the hospital, Hamlin was placed in intensive care, given antibiotics and placed on a mechanical ventilator. This treatment proved effective and on July 15, 1982, the antibiotics were discontinued and he was removed from the ventilator. During this period Hamlin appeared to

be awake, he opened his eyes and mouth and moved his extremities spontaneously.

On July 19, 1982, Hamlin suffered cardiorespiratory arrest from which he was resuscitated. The lack of oxygen, however, had completely destroyed cerebral cortical activity. Afterward, his neurological function consisted of only brainstem function (function of the primitive control area which controls breathing, heart rate and other automatic functions located in the region where the spinal cord enters the brain). Technically, Hamlin's neurological status was: he maintained cardiac activity; he maintained attempts at breathing; he had slight withdrawal of the extremities to deep pain; and he had corneal reflexes. He did not have any spontaneous muscle movements and showed no evidence of any neurological activity above the brainstem.

The attending physicians testified that recovery of any neurological function by Hamlin beyond his then level of brainstem activity would be unprecedented. Furthermore, removal of life support systems would be expected to cause his respiration to cease in a short time and his body would die naturally. They also asserted that in such cases it was medically and ethically wrong to continue life support systems. Therefore, the medical staff recommended that Hamlin not be resuscitated in the event of cardiopulmonary arrest or respiratory failure, withdrawal of mechanical ventilation and no further treatment with antibiotics.

Hamlin had no family, relatives or close friends with which the medical staff could consult concerning his treatment. The treating physicians asked Hamlin's guardian, the Foundation, to consent to termination of the mechanical ventilator. The Foundation refused to consent because it believed it lacked authority to so consent and that consent was prohibited by RCW 11.92.040(3). After this refusal the Hospital petitioned the superior court for an order authorizing termination.

The trial court reappointed attorney Pasette as Hamlin's guardian ad litem. The guardian ad litem's position was that (1) no invasive measures should be taken in the event

of a cardiopulmonary arrest, and (2) removal from mechanical ventilation should not be done until brain death occurred. The Foundation argued the same points as outlined earlier.

The trial court heard testimony from Hamlin's two attending physicians, testimony from a physician who examined Hamlin at the request of the Foundation, and also received Hamlin's medical records. Those records show that at least 20 physicians examined Hamlin. All physicians reached the same conclusion, to wit: Hamlin was in a vegetative state, completely unresponsive to his surroundings, unable to breathe without a respirator and with virtually no prospect of recovery to his preadmission condition.

Based on the foregoing, the trial court concluded that it was in Hamlin's best interests to authorize the withholding and withdrawal of life sustaining treatment. The court entered an order holding:

1. In the event of cardiopulmonary arrest or respiratory failure, Hamlin should not be resuscitated;

2. Hamlin should not be provided antibiotics in the future;

3. The mechanical ventilator should be withdrawn from Hamlin and not reapplied;

4. The foregoing order should not be implemented until the time for appeal has expired.

It was stipulated by the parties that the order should not be implemented until the case had been decided on appeal.

I

The first issue is whether the guardian, as part of its duty to care for and maintain the ward, may terminate life support systems. RCW 11.92.040(3) provides in part:

It shall be the duty of the guardian . . .

(3) Consistent with the powers granted by the court, if he is a guardian or limited guardian of the person, to care for and maintain the incompetent or disabled person, assert his or her rights and best interests, and provide timely, informed consent to necessary medical procedures . . .

The guardian argues that the statutory words "care for and maintain", absent definition by statute or judicial decision, must be given their usual and customary meaning. Admittedly, a literal dictionary definition would seem to exclude authority to consent to termination. A decision to terminate life support systems, however, transcends dictionary definitions. Absent an applicable constitutionally valid statutory procedure to resolve this most fundamental question, we must fashion procedures to provide guidance to those who must directly face termination decisions.

The duties of the guardian are defined in RCW 11.92.010 *et seq.* The statute provides that the guardian is to assert the ward's rights and best interests and provide timely, informed consent to necessary medical procedures. RCW 11.92.040(3). Thus, the guardian has the duty and, therefore, the power to act in the best interests of the ward, to assert the ward's rights, and participate in medical decisions. Just as medical intervention is, in the majority of cases, clearly in the best interests of the ward, nonintervention in some cases may be appropriate and, therefore, in the ward's best interest. We emphasize that these decisions must be made on a case–by–case basis with *particularized consideration of the best interests and rights of the specific individual.* We also stress the distinction between treatment which is expected to result in some measure of recovery and that which merely postpones death. *See, e.g., Superintendent of Belchertown State Sch. v. Saikewicz,* 373 Mass. 728, 370 N.E.2d 417 (1977); *In re Storar,* 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266 (1981).

All physicians who examined Hamlin agreed with the diagnosis that he was in a persistent vegetative state with no prospect of regaining his cognitive functions, maintained by life support systems, and that withdrawal of those systems would lead to his natural death in a short time. Under these circumstances the guardian could conclude that it was in Hamlin's best interests to terminate the life support systems. We hold, therefore, that the guardian did have authority to consent to withdrawal of life support systems.

*In re Colyer,* 99 Wn.2d 114, 660 P.2d 738 (1983); *Custody of a Minor,* 385 Mass. 697, 434 N.E.2d 601 (1982); *In re P.V.W.,* 424 So. 2d 1015 (La. 1982).

■ The guardian also argues that RCW 70.122, the Natural Death Act (NDA), prescribes the exclusive method for withholding or withdrawing life sustaining procedures. While that act evidences a public policy recognition of that right, it is not exclusive. *Colyer* illustrates our conclusion that the act is not the only source for determination of these issues. Moreover, by its terms, the NDA is limited to persons of sound mind. RCW 70.122.010 and .030(1)(d). Thus, Hamlin could never have executed a valid directive under the act. An incompetent patient does not lose his right to consent to termination of life supporting care by virtue of his incompetency. *Colyer,* at 124. *Accord, In re Quinlan,* 70 N.J. 10, 355 A.2d 647, *cert. denied,* 429 U.S. 922, 50 L. Ed. 2d 289, 97 S. Ct. 319 (1976); *Superintendent of Belchertown State Sch. v. Saikewicz, supra; Leach v. Akron Gen. Med. Ctr.,* 68 Ohio Misc. 1, 426 N.E.2d 809 (1980); *Severns v. Wilmington Med. Ctr., Inc.,* 421 A.2d 1334 (Del. 1980), *decision on remand,* 425 A.2d 156 (Del. Ch. 1980); *John F. Kennedy Mem. Hosp., Inc. v. Bludworth,* 452 So. 2d 921 (Fla. 1984); *In re P.V.W., supra.*

## II

We now turn to the more perplexing question of what procedures, judicial or nonjudicial, should be employed in resolving these most fundamental societal questions.

In *Colyer,* we established a set of procedural guidelines to follow in future cases involving the withholding or withdrawal of life sustaining treatment from an incompetent patient.

> If a court determination is required, a guardian ad litem must be appointed to ascertain and protect the interests of the patient. At such a proceeding, the focus would be a determination of the rights and wishes of the incompetent. The appointment of the guardian would be presumed valid, unless there is a showing of clear error or an abuse of discretion, and the conclusion of the progno-

sis board would also be presumed correct. On the basis of information presented to it, the court would determine, in its best judgment, whether the facts demonstrated that the incompetent would have chosen to exercise his or her right to refuse treatment, if he or she were able to do so.

*Colyer,* at 136–37. The procedures followed by the trial court in this case substantially complied with these procedural guidelines.

A guardian and guardian ad litem were appointed to safeguard the interests of Hamlin. While there was no prognosis committee because this situation arose prior to our decision in *Colyer,* there was consensus among all physicians who examined Hamlin that there was no reasonable possibility of his returning to a cognitive sapient state. Finally, the trial court, on the basis of the information presented to it, determined that in its best judgment, the facts demonstrated that the incompetent would have chosen to exercise his right to refuse treatment if he were able to do so.

The trial court's considerations and conclusions essentially met the *Colyer* criteria as applied to these particular facts. We hold that the trial court's rulings were correct.

The foregoing analysis seemingly ends our inquiry. However, the parties ask us to reexamine our position in *Colyer* concerning judicial involvement in the decisionmaking process. Specifically, they ask us to reassess the role of a guardian in *Colyer*–type situations; *i.e.,* total agreement among the patient's family, treating physicians and prognosis committee as to the course of medical treatment. Additionally, they ask us to delineate guidelines concerning the role of the court in *Hamlin*–type situations, an incompetent with no known family, who has never made his wishes known. We limit our discussion to the facts presented by *Colyer* and this case.

[T]here must be a way to free physicians, in the pursuit of their healing vocation, from possible contamination by self–interest or self–protection concerns which would inhibit their independent medical judgments for the

well–being of their dying patients. We would hope that this opinion might be serviceable to some degree in ameliorating the professional problems under discussion.

*In re Quinlan,* 70 N.J. 10, 49, 355 A.2d 647, *cert. denied,* 429 U.S. 922, 50 L. Ed. 2d 289, 97 S. Ct. 319 (1976). *Accord, Barber v. Superior Court,* 147 Cal. App. 3d 1006, 195 Cal. Rptr. 484 (1983).

### A. *Colyer*–Type Situations

In *Colyer,* we held that RCW 11.92.040(3) enables a guardian to use his best judgment and exercise, when appropriate, an incompetent's personal right to refuse life sustaining treatment. *Colyer,* at 131. We concluded that although appointment of a guardian is a judicial process, once the guardian is appointed, the courts need not be involved in the substantive decision to refuse or withdraw life sustaining treatment. *Colyer,* at 129–30. Language used in *Colyer,* however, can be construed to require appointment of a guardian before *any* treatment decision can be made concerning an incompetent patient. This, however, is not the intended result.

██ Guardianship proceedings are often used in cases where patients are incapable of making decisions concerning medical treatment. We do not feel that guardianship proceedings are a necessary predicate to effective decisionmaking in this type of situation. If the incompetent patient's immediate family, after consultation with the treating physician and the prognosis committee, all agree with the conclusion that the patient's best interests would be advanced by withdrawal of life sustaining treatment, the family may assert the personal right of the incompetent to refuse life sustaining treatment without seeking prior appointment of a guardian. *Accord, John F. Kennedy Mem. Hosp., Inc. v. Bludworth,* 452 So. 2d 921 (Fla. 1984); *Barber v. Superior Court,* 147 Cal. App. 3d 1006, 195 Cal. Rptr. 484 (1983); *see also* President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, *Deciding to Forego Life–Sustaining*

*Treatment* (1983).

In *Colyer* we stated that guardianship hearings would not be overly burdensome, but upon reflection, the approach that best accommodates these most fundamental societal decisions is to allow the surrogate decision maker, the family, to make the decision free of the cumbersomeness and costs of legal guardianship proceedings. If all parties, the immediate family, the treating physicians and the prognosis committee, agree as to the course of treatment, a guardian is not necessary. *John F. Kennedy Mem. Hosp., Inc. v. Bludworth, supra.*

The principal function the guardianship process serves is to protect against abuse by preventing "too precipitous a decision or the appointment of one with less than proper motives." *Colyer,* at 130. Arguably then, elimination of the guardianship process would eliminate these safeguards and open the door for abuse. We are convinced that the remaining procedural safeguards surrounding this decision will adequately protect against abuse.

First, this decision can be reached only after there is a medical diagnosis by the attending physicians that (1) the incompetent patient is in a persistent vegetative state with no reasonable chance of recovery and (2) the patient's life is being maintained by life support systems. Throughout this initial diagnosis process the treating physicians are under an ethical, moral and legal duty to treat the patient so as to advance his recovery and alleviate his suffering. Second, this initial diagnosis must be unanimously approved by the prognosis committee.

### B. *Hamlin*–Type Situations

In *Colyer,* we stated in dicta that there will be instances when the detached opinion of the judiciary would be required in the substantive decision to withhold treatment.

> For example, if there is disagreement among family members as to the incompetent's wishes or among the physicians as to the prognosis, if the *patient has always been incompetent so that his wishes cannot be known,* if there is evidence of wrongful motives or malpractice, *or if*

*there is no family member to serve as guardian,* the court may be required to intervene.

(Italics ours.) *Colyer,* at 136. This dicta indicates that even if all parties agreed, because Hamlin had no family and has always been incompetent, the judiciary would be required to make the substantive decision to terminate life sustaining procedures. Presented with the actual situation envisioned by this dicta, we believe the judiciary's role is not that broad.

Hamlin had no available family. Therefore, a surrogate decision maker must be provided to ensure that Hamlin's interests are represented. The surrogate decision maker, like a family, provides an objective viewpoint to evaluate the medical prognosis. More importantly, like a family, the surrogate decision maker guarantees that decisions in cases such as Hamlin's remain individualized. Accordingly, when a family is not available and the patient is incompetent, a guardian must be appointed pursuant to RCW 11.88.010 *et seq.* to represent the patient's best interests.

The court will always be involved in the appointment of the guardian. As discussed here and in *Colyer,* at pages 128–32, the duties of the guardian are to assert the "rights and best interests" of the incompetent person. RCW 11.92-.040(3). This includes the power to assert the incompetent's personal right to refuse life sustaining treatment. *Colyer,* at 131.

However, the court need not always be involved in the actual substantive decision. Therefore, like the familial situation, if the treating physicians, the prognosis committee, and the guardian are all in agreement that the incompetent patient's best interests are served by termination of life sustaining treatment, absent legislation to the contrary, there is no need for judicial involvement in this decision.

Thus, we believe the following procedures will best serve all interests involved in this type of case:

1. Upon appropriate application, a general guardian must be appointed; the appointment of a guardian ad litem is

governed by RCW 11.88.090;

2. If the treating physicians and prognosis committee are unanimous that life sustaining efforts should be withheld or withdrawn and the guardian concurs, judicial approval is not required;

3. Conflicts within or between the hospital, prognosis committee, attending physicians or the guardian should be determined by the trial court.

To the extent that these holdings modify dicta in *In re Colyer, supra* at 136, it is so held.

### III

As a concluding point for both situations, we retain the rule announced in *Colyer,* at page 136, any participant in the decision, members of the incompetent's family, the guardian, the physicians, or the hospital may petition for court intervention. Similarly, if there is disagreement between parties involved in the decisionmaking process, court intervention would be appropriate.

We note that this is the third time this court has been required to deal with these fundamental, indeed life or death, issues. *In re Bowman,* 94 Wn.2d 407, 617 P.2d 731 (1980); *In re Colyer, supra;* and this case. We also note that three states have passed natural death legislation that specifically provides for withdrawal of life sustaining treatment for patients who have not executed a natural death directive and are diagnosed as comatose with no reasonable possibility of returning to a cognitive sapient state. *See* N.C. Gen. Stat. § 90–322 (Cum. Supp. 1979); Or. Rev. Stat. § 97.050–.090 (1979), *amended by* 1983 Or. Laws, ch. 526, § 3 (H.B. 2963, filed July 20, 1983); Va. Code § 54–325.8:1–12 (Supp. 1983).

The problem before us involves social, moral and ethical considerations as well as complex legal and medical issues for which the legislative process is best suited to address in a comprehensive manner. *See* President's Commission for the Study of Ethical Problems in Medicine and Biomedical and Behavioral Research, *Deciding to Forego Life–Sus-*

*taining Treatment* (1983). The Legislature is the better forum in which to fashion the necessary procedures to safeguard the rights and liabilities of the many persons and institutions involved in this complex arena. Many other courts have reached the same conclusion. *See, e.g., Severns v. Wilmington Med. Ctr., Inc.*, 421 A.2d 1334 (Del. 1980); *In re Eichner*, 73 A.D.2d 431, 426 N.Y.S.2d 517 (1980). Like these courts, we urge our Legislature to act in this matter.

## IV

One matter remains. After the Hospital and the Foundation disagreed as to withdrawal of life support, the guardian ad litem was reappointed to represent Hamlin's interests in superior court. The order reappointing Ms. Pasette authorized payment at $35 per hour for 10 hours' work. Prior to trial, an additional 20 hours of service at $35 per hour was authorized. This order was for the time spent in trial preparation and did not authorize any additional hours of service for her trial participation.

The guardian ad litem proposed an order authorizing additional funding which was reserved by the trial court for a later point in the trial. At the close of the trial, the court had still not acted.

Meanwhile, the Foundation appealed to this court. Ms. Pasette continued, in good faith, to represent the interests of Hamlin on appeal. Only after filing her opening brief did she learn that the County was not going to pay her costs on appeal because it argued it was not responsible for the costs of guardians ad litem at the appellate level. The County's position was that the Supreme Court had funds for indigent appeals and would pay Ms. Pasette's costs. Accordingly, at this point Ms. Pasette obtained an order of indigency nunc pro tunc to October 1982 to allow her to seek appellate costs from this court. *See* RAP 15.2(b), (c).

Despite not knowing which entity, the County or the State (if either), would pay for her services as Hamlin's guardian ad litem on appeal, she filed two more briefs with

this court and made oral argument. She asks this court to award her reasonable compensation, both for her work at trial and on appeal, and to determine which entity is responsible for paying that compensation. King County intervened in this court solely on the issue of who should pay for Ms. Pasette's work on appeal.

■ The County does not dispute that Ms. Pasette is entitled to her fees and costs on appeal. To hold that a guardian ad litem must appear on appeal without any prospect of compensation would detract from the quality of service to the incompetent and the court, ultimately leading to a scarcity of guardians ad litem willing and able to accept appointment. *Cf. Honore v. Board of Prison Terms & Paroles,* 77 Wn.2d 660, 679, 466 P.2d 485 (1970). As guardian ad litem, Ms. Pasette served both the public interest and Hamlin's interest. *See Wilmington Med. Ctr., Inc. v. Severns,* 433 A.2d 1047 (Del. 1981). Therefore, we agree that she should be compensated from public funds.

RCW 11.88.045(1) provides in relevant part:

> An alleged incompetent or disabled person is entitled to independent legal counsel at his own expense to represent him in the procedure: *Provided,* That if the alleged incompetent or disabled person is unable to pay for such representation . . . the county shall be responsible for such costs . . .

RCW 11.88.090(6) provides in relevant part:

> The guardian ad litem shall receive a fee determined by the court. . . . [If] the court finds that such payment would result in substantial hardship upon [the incompetent] . . . the county shall be responsible for such costs . . .

The County argues that its liability under RCW 11.88-.045 and .090 is limited to fees for representation in the superior court and that RCW 4.88.330 and RAP 15.2(b) place financial responsibility for appellate work upon the State. We do not agree. By its terms RAP 15.2(b)(2) is limited to criminal cases and those involving termination of parental rights and juvenile offenses.

Similarly, RAP 15.2(b)(3) read in conjunction with RAP 15.2(c) does not lead to a contrary result. RCW 4.88.330 encompasses only those who seek review and have a constitutional right to review.

While RCW 4.88.330 imposes upon the State the sole responsibility for funding indigent appeals, *Darrell E. Lee Law Office v. State*, 99 Wn.2d 270, 274, 661 P.2d 136 (1983), the guardian ad litem is neither an appellant nor indigent. Therefore, she is not entitled to fees in her own right. Moreover, assuming arguendo that Hamlin had a constitutional right to appeal, *see* RAP 15.2(c), RAP 15.2 encompasses only waiver of filing fees, costs of preparing the record and attorney fees on appeal. *See* RAP 15.2(d). As the County admits in its brief, Ms. Pasette was never appointed as counsel for Hamlin and, therefore, is not entitled to reimbursement from the State.

While RCW 11.88.045 and .090 are not clear as to their application to fees on appeal, we hold that those statutes impose financial responsibility upon the County. The statutes evidence that incompetency matters are matters of local concern and, therefore, the County should pay for costs of representing incompetents' interests at both the trial and appellate levels. Therefore, the matter is remanded to superior court for determination of those fees. As part of that determination the superior court is instructed to ascertain if payment at $35 per hour is reasonable compensation. The trial court is otherwise affirmed.

WILLIAMS, C.J., UTTER, DOLLIVER, DIMMICK, and PEARSON, JJ., and CUNNINGHAM, J. Pro Tem., concur.

ROSELLINI, J. (dissenting)—The majority departs dramatically from the issues presented in this case, and needlessly resolves questions not before it. Because I believe the court's discussion of court intervention is both unnecessary and unwise, I dissent.

The unnecessary nature of the majority's discussion is obvious. As the majority observes, Joseph Hamlin "had no

family, relatives or close friends with which the medical staff could consult concerning his treatment." Majority opinion, at 813. Decisions regarding his treatment were developed by the medical staff and offered to an appointed guardian for approval. The guardian, believing it was without authority, disapproved. This appeal then arose. The case presented essentially one issue to the court. That issue involved only who had authority to consent to termination of life support systems.

The majority, after properly resolving this issue, then seizes the opportunity to discuss generally the necessity of guardianship proceedings and court intervention. The majority concludes that if the patient's medical prognosis board and the family all agree, neither a court appointed guardian or court intervention is required. Where the patient has no family, the majority allows these decisions to be made by the guardian and the medical staff.

The majority adopts this position without exploring the ramifications of its rule or the wisdom of waiving court intervention. Closer analysis of these issues, I believe, demonstrates the dangers of a court attempting to resolve so complex a problem with such simple rules.

First, the majority's decision to circumvent court appointed guardian proceedings negates the safeguards inherent in the guardian statutes and authorizes, illegally, a person other than the patient to exercise the patient's right to refuse treatment. *In re Colyer*, 99 Wn.2d 114, 660 P.2d 738 (1983) established that the right to refuse treatment is a corollary of the constitutional right to privacy and the common law right to be free from bodily invasion. *Colyer*, at 121. This right, however, is personal to the patient. Only the guardian statute, RCW 11.92.010, contains an acknowledged mechanism for transferring the privilege of exercising this right to someone other than the patient. Nowhere does the majority explain its authority to ignore the legislative scheme in favor of a de facto guardianship by the family. Absent patient consent, no such authority exists.

Moreover, competency is a legal determination which

must be made by a court. The majority's decision to forgo guardianship proceedings delegates the judicial responsibility to determine a legal status to the medical profession and the family.

The majority's decision to waive the guardianship proceeding is also unwise in that it removes important safeguards to the decisionmaking process. Without a guardianship proceeding, the decision to terminate life support systems may be made by family members who have improper motives or whose views do not reflect those of the patient. Furthermore, neither the fact that all family members need to agree nor the concurrence of the medical prognosis board adequately protects against this eventuality. Where family members all stand to benefit by termination, they would naturally agree and present a unified front.

Moreover, medical professionals cannot guard against improper motives on the part of the family because they are neither suited by training nor situation to discover such impropriety. Doctors are trained to discover and treat disease and trauma, not to discern the truth of factual assertions. Also, a doctor may not, without significant impertinence, inquire as to the family members' financial relationships to the patient. In fact, a doctor may not be able to even ascertain if all family members have been consulted or even notified of the event. Distant siblings or offspring may be omitted from the decisionmaking process until it is too late for the decision to be reversed.

The majority's opinion ignores these dangers; I cannot.

On the other hand, I am not unsympathetic to the majority's desire to mitigate the legal formalities a grieving family must confront. Alternatives to the all or nothing rule propounded by the majority exist, however. For instance, in cases where family members can demonstrate the patient's intent to vest them with authority to act in this manner, guardianship proceedings might be unnecessary. Such manifestation could be more informal than the Natural Death Act documents but still vested with some safeguards. A

patient's informal consent to the doctor, witnessed by one of his staff, might be sufficient.

I believe the medical profession, the Legislature and the courts must pursue all available alternatives with full knowledge of each solution's implication. Because the majority attempts to resolve these issues without a proper case before it, I dissent.

DORE, J., concurs with ROSELLINI, J.