Dear Ms. Hunt:
I am in receipt of your request for an Attorney General's opinion concerning the establishment of a policy by the Louisiana Board of Elementary and Secondary Education (BESE) and each local educational agency (LEA) or other approved school for school personnel to honor, or refuse to honor, a parent/guardian's advance medical directive, such as do not resuscitate (DNR). There is no jurisprudence concerning DNRs in schools in Louisiana and there are only two court rulings on this issue in other states and one attorney general opinion.
The first ruling is an Office of Civil Rights ruling in Maine in the matter of Lewiston (ME) Pub. Sch., 2 ECLRR 121 (OCR 1994). In that case, the complainant alleged that the district discriminated against a 12-year-old student with a disability by adopting a directive that denied the student the same life-sustaining emergency care that was provided to other students. During OCR's investigation, the district had a new policy on life-sustaining emergency care which prohibited it from complying with requests from parents or others to withhold treatment from any student. The district's policy did not distinguish between students with and without disabilities, but did allow for the development of individually designed medical resuscitation plans by multidisciplinary school-based teams for students who required such plans.
OCR determined that this policy did not conflict with Section 504 of the Rehabilitation Act or Title II of the Americans with Disabilities Act. OCR also upheld the individual medical resuscitation plan designed for the student-in-question, which described in positive terms the specific steps to be taken by school personnel if the student required life-sustaining medical care while under the district's supervision and was the only individualized plan in effect at the time of OCR's investigation. The plan was designed by a multidisciplinary team of persons knowledgeable about the student including the student's parent, physician, and appropriate school personnel. It was based on expert medical and other relevant information about the student, was appropriately documented, required a second medical opinion, and was of limited duration, ensuring that it would be reevaluated periodically.
In ABC School v. Mr Mrs. M, 26 IDELR 1103, (Mass. Super Ct. 1997) the parents of a 4-year-old child who is severely disabled, both mentally and physically, obtained a "Do Not Resuscitate" order from the child's physician. The order prohibited the child from receiving "cardiopulmonary resuscitation, intubation, defibrillation, or cardiac medications", in the event the child goes into cardiac arrest while at school. The school sought dilatory and injunctive relief allowing it to refuse to honor the DNR order due to ABC School's "Preservation of Life Policy." The parents also sought declaratory relief that any refusal to honor the DNR order would violate the child's constitutional right to refuse medical treatment.
ABC's request for injunctive relief was denied and the parents motion for declaratory relief was allowed. The Court found the likelihood of success on the merits favored the parents and that the equitable considerations supported the parent's position. The Court citedSuperintendent of Belchertown v. Joseph Saikewicz, 373 Mass. 728
(1977) in holding that the right to refuse medical treatment on behalf of the child is constitutionally protected and must be honored by ABC School. Compliance with the DNR order only prohibited the school R.N. from conducting CPR and administering medication. The Court found this did not place an undue burden on the school and mandated the school to comply with the DNR order.
In Maryland Attorney General Opinion No. 94-028, the attorney general addressed the issue of whether schools must comply with DNR orders. The opinion concludes that if the attending physician of a terminally ill child has entered a DNR order on the authorization of the child's parents, school officials must accept the order and refrain from medical interventions that are not consistent with it. The author further added that the opinion is not saying that school officials should stand by and do nothing if a child suffers a cardiac arrest at school. The school employees are to do something crucially important — "give comfort and reassurance to the child."
The attorney general placed considerable weight on Maryland's new Health Care Decisions Act which specifically recognizes that DNR orders must be respected outside of health care facilities, in particular by emergency medical technicians. Maryland law requires school health services professionals and others in each school to be certified in CPR.
Both the Individuals with Disabilities Education Act and Section 504 of the Rehabilitation Act guarantee to disabled students the right to receive an education "to the maximum extent appropriate" with their nondisabled peers. (See 20 U.S.C. § 1412 (5)(B), 34 C.F.R. § 104.34
and 34 C.F.R. 300.554).
In Timothy v. Rochester, New Hampshire, School District, 875 F.2d 954
(1st Cir. 1989), the Court held that the Education of All Handicapped Children Act did not require that a handicapped child demonstrate that he could benefit from special education in order to be eligible for that education. Therefore, there is no "benefit/eligibility" requirement for a child to be eligible for public education.
The United States Supreme Court addressed the issue of whether there is a constitutional right to refuse life-sustaining medical care. InCruzan v. Director, Missouri Department of Health, 110 S.Ct. 2841
(1990), the Supreme Court held that while there was no absolute right to refuse such care, a competent individual would clearly have a constitutionally protected "liberty interest" in his or her decision to refuse medical treatment. Citing Parham v. J R., 995 S.Ct. 2493,2503 (1979), the Supreme Count noted that its earlier decisions implied that a child would have a similar liberty interest.
However, simply recognizing a "liberty interest" in decisions regarding medical care would not end the analysis, according to the Supreme Court. The Court held that whether rights are violated in a particular case must be determined by balancing the person's liberty interest against any relevant state interests that may be involved. The state may have interests that outweigh the "liberty interest" a person may have in certain circumstances.
Additionally, in Cruzan, the individual involved was incompetent. The Supreme Court noted the difficulty of applying to an incompetent person the liberty interest in refusing life sustaining medical care, particularly in light of the uncertainty regarding what the person would actually want in that circumstance and because a mistaken decision to terminate care is irreversible. The Supreme Court concluded that the State of Missouri, through its Supreme Court, had made a permissible decision in requiring "clear and convincing" evidence before giving effect to a person's desire while competent to discontinue life-sustaining medical care if in a persistent vegetative state.
A review of Louisiana law and jurisprudence appears to indicate that a (DNR) policy does not apply to children that are not terminally ill. There previously had been two distinct sets of special statutes which governed the issue of medical treatment of terminally ill children. Both sets of statutes addressed the limitations upon parental decisions concerning when extraordinary medical intervention might be discontinued for children. LSA-R.S. 40:1299.36.1 et seq. enacted in 1982 was repealed by the Children's Code and LSA-R.S.40:1299.58.1 et seq. which deals with life-sustaining procedures in general is currently still in effect.
LSA-R.S. 40:1299.58.1 allows individuals that have been diagnosed as having a terminal and irreversible condition to control the decisions relating to their own medical care. It states the following in pertinent part:
 A. Purpose and findings. (1) The legislature finds that all persons have the fundamental right to control the decisions relating to their own medical care, including the decision to have life-sustaining procedures withheld or withdrawn in instances where such persons are diagnosed as having a terminal and irreversible condition.
LSA-R.S. 40:1299.58.6 states the following concerning making a declaration for the benefit of a terminally ill minor:
 A. If a minor has been certified as a qualified patient, the following individuals may voluntarily make a declaration to document the decision relative to withholding or withdrawal of medical treatment or life-sustaining procedures on a minor's behalf:
 (1) The spouse if he has reached the age of majority; or
 (2) If there is no spouse or if the spouse is not available, or is a minor, or is otherwise unable to act, then either the parent or guardian of the minor.
 B. An individual named in Subsection A of this Section may not make a declaration:
 (1) If he has actual notice of contrary indications by the minor who is terminally ill; or
 (2) If, as a parent or guardian, he has actual notice of opposition by either another parent, or guardian, or a spouse who has attained the age of majority.
 C. Nothing in this Section shall be construed to require the making of a declaration for a terminally ill minor. The legislature intends that the provisions of this Part are permissive and voluntary. The legislature further intends that the making of a declaration pursuant to this Part merely illustrates a means of documenting the decision relative to withholding or withdrawal of medical treatment or life-sustaining procedures on behalf of a minor.
Louisiana law does not address the responsibility of this type of declaration being complied with by school personnel. It only addresses the responsibility that an attending physician has when treating a terminally ill patient. (See LSA-R.S. 40:1299.58.7.)
Chapter 7 of the Children's Code specifically addresses the protection of terminally ill children. As stated in Article 1551,
 The purpose of this Chapter is to recognize the right of a parent or guardian to make a declaration pursuant to which life-sustaining procedures or other medical care may be withheld or withdrawn from certain terminally ill children and to authorize judicial review, if needed, by the juvenile courts of such decisions if a child's parents or physician cannot agree that the requirements of this Chapter have been met. The procedures authorized by this Chapter are in addition to the existing remedies of Title VI.
Ch. C. Art 1553 states the following;
 Art. 1553. Deprivation of comfort care prohibited
 No child, including any infant born alive, shall be denied or deprived of food or nutrients, water, oxygen, or comfort care by any person with the intent to cause or allow the death of the child for any reason, including but not limited to the following situations:
 (1) The child was born with physical or mental handicapping conditions which, in the opinion of the parent, the physician, or other persons, diminishes the quality of the child's life.
 (2) The child was born alive in the course of an attempted abortion.
 (3) The child is not wanted by the parent.
Article 1554 of this Code sets forth the following concerning the deprivation of medical or surgical care prohibited for terminally ill children:
 No child, including any infant born alive, shall be intentionally denied or deprived of any medical or surgical care by his parent, physician, or any other person when such medical or surgical care is necessary to attempt to save the life of the child in the opinion of a physician exercising competent medical judgment, except:
 (1) When a child is in a continual profound comatose state and in the opinion of the child's physician, exercising competent medical judgment, he has no reasonable chance of recovery from that state despite every appropriate medical treatment to correct such condition, the child's parents and physician may discontinue the use of life-support systems or other medical treatment.
 (2) When a child suffers from a terminal and irreversible condition despite every appropriate medical treatment to correct such condition, the child's parents and physician may discontinue the use of life-sustaining procedures or other medical treatment.
 (3) When the potential risks to the child's life or health inherent in any treatment or surgery outweigh the potential benefits for survival from the treatment or surgery, a child's parents and physician may decline to provide potentially lifesaving medical or surgical care for the child.
Section one provides for an exception when a child is in a continued profound comatose state and in the opinion of the child's physician has no reasonable chance of recovery. Article 1552 (3) defines "continual profound comatose state" to mean that there is no reasonable medical possibility of ever achieving a cognitive state of conscious perception.
Additionally, this exception states that the parents and physician may discontinue the use of life support systems or other medical treatment. This implies that the child is already on life-support or other medical treatment and therefore it is unlikely that a child would be in a classroom setting.
Section two provides for an exception when a child who suffers from a terminal and irreversible condition and is already on some type of life-sustaining procedure or other medical treatment. Art. 1552 (6) defines "[l]ife-sustaining procedure" as any medical procedure or intervention which, within reasonable medical judgment would serve only to prolong the dying process. It does not include any measure deemed necessary to provide comfort care. Therefore, this exception is also very unlikely to apply in a school environment because the individual would not be on life support or other medical treatment and attending school.
The exception in Section three refers to when a child's parent and physician may decline to provide potentially life saving medical care for a child. This is the exception that concerns the issue you have addressed in your request. As stated in the exception, the potential risks to a child's life or health inherent in any treatment or surgery must outweigh the potential benefits for survival from the treatment or surgery.
Ch. C. Articles 1555 and 1556 provide the following concerning the certification of a child's terminal status and the declaration for a terminally ill child. They state:
 Art. 1555.
 Before the discontinuation of any medical care or treatment, the child must be diagnosed and certified in writing as qualifying within one or more of the exceptions authorized by Article 1554 by two physicians who have personally examined the child, one of whom shall be the child's attending physician.
 Art. 1556.
 If a child has been certified as required by Article 1555, the child's parent or his guardian may make a declaration to document the decision concerning the withholding or withdrawal of medical treatment or life-sustaining procedures on the child's behalf, except where either:
 1) The parent or guardian has actual notice of contrary indications by the affected child.
 (2) The parent or guardian has actual notice of opposition to the decision by the other parent or by the child's guardian.
C. Ch. Art. 1557 concerns the preparation of a declaration for the benefit of a terminally ill child and the requirements for proper notification.
Please note that the language in this article tracks that found in LSA-R.S. 40:1299.58.6.
In June of 1994, the National Education Association (NEA) adopted a policy on Do Not Resuscitate Orders which is still the current policy of this association. It states the following in pertinent part:
 The proposed policy does not take a position on whether school districts should, as a matter of public policy, honor DNR orders; that is an issue that should be resolved at the state/and or local level. However, in considering a request to honor a DNR order, the school district should consult with counsel to determine what legal rights and responsibilities it has, including the applicability of a collective bargaining agreement.
While requests to honor DNR orders must be handled on a case-by-case basis, NEA recommends that no request be granted unless the following minimum conditions are met:
 1. The parents' or guardians' request is submitted in writing and accompanied by a written DNR order signed by the student's primary licensed physician.
 2. The school district establishes a "team" consisting of the parents/guardians, student's physician, school nurse, student's teacher(s) appropriate support staff, and school superintendent or designee to consider the request. The team first considers all available alternatives. If no other option is acceptable to the parents/guardians, then the team develops a "medical emergency plan, " which includes the following essential elements:
 a. The plan specifies what actions the student's teacher or other school employee should take in the event that the student suffers a cardiac arrest or other life-threatening emergency, e.g., telephone the local emergency medical service, apply emergency procedures as determined by the team, contact the parents/guardians, evacuate other students from the classroom, etc.
 b. All school employees who may have supervision of the student during the school day are fully briefed on the procedures to follow in the event of a medical emergency involving the student.
 c. The student wears an ID bracelet while at school indicating that he/she is subject to a DNR order and a medical emergency plan.
 d. The parents execute a contract with the local emergency medical service providing that the service will honor the DNR order, a copy of the contract is made available to the school superintendent/designee.
 e. The team agrees to review the plan and the student's health condition at least on an annual basis.
 3. School staff receives the necessary training, and counseling, and educational Death and Dying programs are provided for students. In the event the student subject to a DNR order dies, appropriate counseling will be provided to staff and students.
As discussed in The Legal Framework for Responding to DNR Orders on School Grounds authored by Eric R. Herlan, found in the Individuals with Disabilities Education Law Report, Special Report No. 11, in determining the right to die in any state, the author suggests that the following questions should be asked:
 (I) whether the right to discontinue care has been recognized beyond those who are terminally ill or in a persistent vegetative state;
 (ii) whether the state requires proof of the actual desires of the person at issue, or is willing to accept a "substituted judgment" made by someone else on behalf of that person;
 (iii) whether state law has applied the right to control medical care outside the context of health care facilities; and
 (iv) whether state law delineates who should make the decision to implement a directive to discontinue care in a particular situation.
LSA-R.S. 40:1299.58.6 and Art. 1554 of the Children's Code discuss the deprivation of medical or surgical care for terminally ill children. Louisiana law is absent of legislation concerning deprivation of medical or surgical care for children that are not terminally ill.
As discussed in Superintendent of Belchertown v. Joseph v. Saikewicz,
supra, the Massachusetts Supreme Judicial Court found that the state has four legitimate interests when determining whether a request for emergency life-sustaining care should be sustained. They are the following:
 (1) the preservation of life; (2) the protection of the interests of third parties; (3) the prevention of suicide; and (4) maintaining the ethical integrity of the medical profession.
The interest in preservation of life is much stronger where the medical intervention has some hope of restoring a person to a normal life, and is greatly lessened where the intervention simply prolongs the dying process — such as in the case of persons who are terminally ill or in a persistent vegetative state. In Re Gardner, 534 A.2d At 955.
The second prong as set forth in the Individuals with Disabilities Education Law Report asks whether the State requires proof of the actual desires of the person at issue, or is willing to accept a "substituted judgment" made by someone else on behalf of that person.In Re P.V.W., 424 So.2d 1015 (La. 1982), the Louisiana Supreme Court stated the following:
 In Louisiana, the Legislature has not yet established a procedure for parents, tutors or curators of an incompetent person to withdraw life support systems when the person has entered a permanent and irreversible comatose condition. However, the Legislature in Act 339
of 1982 has at least indirectly recognized the incompetent person's right to have such systems terminated.
 Title 40 of the Revised Statutes pertains to Public Health and Safety. Sections 1299.36.1 through 1299.36.3, enacted by Act 339 of 1982 and effective on September 10, 1982, comprise Part XIX of Chapter 5, which is entitled Miscellaneous Health Provisions.
The Court continued:
 The Legislature, in enacting the pertinent statute, recognized the right of a permanently comatose child to have his parents and physicians discontinue artificially sustained life under certain conditions. Indeed, the fact that the Legislature set forth in detail the specific conditions under which the right may be exercised reinforces our conclusion that the Legislature intended to recognize the child's independent right.
The Louisiana Supreme Count concluded:
 We therefore conclude that a permanently comatose child has an independent right to discontinuance of artificially sustained life through the mechanical invasion of the child's body and that an appropriate representative may judicially assert that right on behalf of the child, either after the event in civil or criminal proceedings or before the event in a declaratory judgment action, the primary role of the court should be to determine whether the appropriate safeguards have been provided and the necessary underlying conditions have been approved.
Although In Re P.V.W. has not been overruled, the Children's Code Chapter 7, Article 1551 et seq., was enacted by Act 1991, No. 235 § 15, effective January 1, 1992. Ch. C. Arts. 1555 and 1556 provide the requirements for certification of a child's terminal status and the declaration for a terminally ill child. Art. 1557 concerns the preparation of the declaration and the proper notification that is required.
Addressing the third prong set forth in the Individuals with Disabilities Education Law Report, Louisiana law has not specifically addressed withholding medical care within a public school context pursuant to a parent/guardian's advance medical directive such as do not resuscitate. Neither does the law address the authority of the state or local board to pass regulations in this area.
Finally, Louisiana law delineates who should make the decision to implement a directive to discontinue care in a particular situation. (See LSA-R.S. 40:1299.58.6 and the Children's Code Chapter 7.)
In conclusion, Louisiana law has not specifically addressed withholding medical care within a public school context pursuant to a parent/guardian's advance medical directive such as do not resuscitate. Therefore, Maryland Attorney General Opinion 94-028 is not controlling. In Cruzan, supra, although the Supreme Court held that while there is no absolute right to refuse life-sustaining medical care, a competent individual would clearly have a constitutionally protected "liberty interest" in his or her decision to refuse medical treatment. In Parham, supra, the Supreme Court noted that a child has a similar liberty interest. In Cruzan, the Supreme Court held that whether this right is violated in a particular case must be determined by balancing the person's liberty interest against any relevant state interest that may be involved.
In Re P.V.W., supra, the Louisiana Supreme Court recognized a child's independent right to discontinue artificially sustained life under certain conditions. Chapter 7 of the Children's Code was enacted in 1992 and sets forth the requirements for certification of a child's terminal status and the declaration for a terminally ill child.
Therefore, it is the opinion of this office that it will not extend the interpretation of the above referenced law to include the public school setting in the absence of specific language to that effect. Further, it is the opinion of this office that neither the state nor any local board has any authority to promulgate any regulation on this topic, in the absence of any legislation that specifically grants such authority.
I hope this opinion sufficiently addresses your concerns. If I can be of further assistance please let me know.
Very truly yours,
 RICHARD P. IEYOUB ATTORNEY GENERAL
 BY: __________________________ BETH C. LANGSTON ASSISTANT ATTORNEY GENERAL
RPI/BCL/sc