[No. 55820–5.   En Banc.   April 4, 1991.]

NANCY C. FARNAM, ET AL, *Respondents,* v. CRISTA MINISTRIES, *Appellant.*

*Philip A. Talmadge* (of *Talmadge Friedman & Cutler*), for appellant.

*Strasburg, Levy & Spitzer, P.S.*, by *Sanford R. Levy* and *Carolyn Gans*, for respondents.

*Jeffrey S. Schuster* on behalf of the American Civil Liberties Union, amicus curiae for respondents.

DURHAM, J.—Nancy Farnam brought a civil action against her employer, CRISTA Ministries (CRISTA), claiming religious discrimination and wrongful discharge in violation of public policy. The jury returned a verdict for Farnam on both counts. CRISTA moved for judgment n.o.v., and the trial court upheld the wrongful discharge claim. However, the court reversed and dismissed the religious discrimination claim, holding that because CRISTA was a religious organization, it was therefore exempt from such actions pursuant to RCW 49.60.040.

As to each ruling, the aggrieved party appeals. We hold that Farnam has not stated a cause of action for wrongful discharge in violation of public policy. Accordingly, the trial court's denial of CRISTA's motion for judgment n.o.v. as to that claim is reversed. We also hold that CRISTA is a religious organization within the exemption of RCW 49.60.040, and affirm the trial court's dismissal of Farnam's religious discrimination claim.

Before proceeding with our analysis, a caution regarding the dissent is in order. This case involves only the interpretation of the applicable law of employment. The dissent's unwarranted foray into the emotionally charged theater of bio–ethics is as dangerous as it is irrelevant. Termination of life support is one of the most complex issues of our time and demands thoughtful and informed analysis. Neither the trial judge nor the parties dealt with this issue, and it has not been presented to this court. As such, it has no place in this case.

I

CRISTA is a nonprofit interdenominational Christian organization, which is a single corporate entity encompassing seven divisions, including schools, counseling services, radio stations and health care facilities. Nancy Farnam was employed as a nurse at one of CRISTA's nursing homes

from approximately April 1979 until September 1985. All CRISTA employees, including Farnam, are required to sign a "doctrinal statement" stating that they adhere to a statement of Christian faith. Farnam testified that she wanted to work at CRISTA because she believed that it was a Christian organization. She also testified that she received assurances, prior to being hired, that CRISTA did not permit the withholding of food and water from patients. At all relevant times, Farnam was a counit supervisor, or primary care nurse, at Poplar Court, the acute care wing of the nursing home.

In July 1984, a decision was made to remove the nasal–gastric feeding tube (NG tube) from Ellen Goodhope. The decision was made by her doctor in connection with a prognosis board and Goodhope's family. Farnam and other nurses objected to the decision. Farnam objected on religious grounds and also because she was concerned that aspiration and pneumonia were likely to occur if she tried to give food or water orally after the tube was removed. It is disputed whether or not CRISTA had a policy requiring the giving of food or water under those circumstances. Because Farnam was Goodhope's primary care nurse, she believed that she was the one who would have to remove the NG tube.

Jeffrey Crandall, the administrator of the nursing center at CRISTA Senior Community, initially told Farnam that she had to remove the NG tube if she wanted to continue working at CRISTA. However, Crandall later changed his position and told Farnam that the removal of NG tubes was not a condition of her employment. Goodhope was transferred to another facility for the removal of her NG tube.

In March 1985, the decision was made to remove the NG tube of another terminal patient, Clarine Perkins. JoAnn Beaumont, assistant director of nursing services, suggested to Farnam that, if she refused to remove the NG tube, she would be transferred to another unit. Again, Farnam objected. Farnam suggested that if the tube was to be

removed, Perkins should be transferred to another unit, rather than transferring the objecting nurses. Eventually, the tube was removed by supervisory staff and Perkins was transferred to another unit within CRISTA.

In April, Farnam and other concerned nurses sent a letter to the head of the Board of Trustees of CRISTA stating that they realized that the removal of NG tubes was legally protected, but they believed it violated their Christian values and CRISTA's image as a Christian provider of care for the elderly. The letter went on to request a meeting with the Board to discuss the issue.

Farnam also spoke with Yong Hall, the long–term care ombudsman at the Washington State Department of Social and Health Services, regarding Farnam's concerns about CRISTA's life support removal policies and her legal rights if she refused to remove NG tubes.

Farnam, through her husband, initiated a contact with The Seattle Times that resulted in an article being printed in that paper. The article, which appeared on the front page of the April 14, 1985 Sunday edition, described CRISTA as having permitted "death by starvation". Farnam was quoted in the article as saying that CRISTA was "trying to make us the executioners. And if I don't like it, I'm supposed to stay quiet." Farnam testified that these quotes were accurate.

Sometime in 1985, in response to an anonymous call, Yong Hall met with Crandall regarding the policies at CRISTA. Hall reviewed CRISTA's policies on the withdrawal of life support systems. She took no action against CRISTA, but suggested that CRISTA form a committee to address the issue and develop clear policies. In late April, CRISTA established an *ad hoc* committee to develop a formal policy with regard to the withdrawal issue.

The reports during Farnam's remaining tenure are disputed. Farnam testified generally that her beliefs were criticized as not being Christian, that her supervisors were spying on her in attempt to document enough deficiencies in her performance to fire her, and that she was unfairly

suspended and criticized in her work evaluation. She claimed that Poplar Court was intentionally understaffed so that she could not complete her work. She filed a grievance pursuant to CRISTA's written policies but contends it was not taken seriously.

CRISTA management employees testified generally that Farnam's work performance was deteriorating. They attributed this to Farnam spending too much time on the feeding tube controversy by organizing meetings, discussing it with others during business hours, and making personal phone calls. Management testified that Poplar Court was not understaffed—Farnam was simply not properly managing her time or delegating duties. Management also testified that, rather than spying on Farnam, it was conducting proper employee evaluations. Management did request that any complaints made regarding Farnam be put in writing. Further, Farnam's grievance had been taken seriously.

On September 3, Farnam's nursing license expired and she was told she would have to leave work until her new license arrived. Farnam contends that CRISTA was singling her out because no other nurse had been sent home in similar situations. CRISTA contends that it was simply complying with applicable state law. Farnam went home the day her nursing license expired and did not return.

Farnam sent CRISTA a letter stating that she considered herself discharged. CRISTA responded with a letter stating that she had not been terminated. CRISTA gave Farnam until September 16 to inform CRISTA of the date she intended to return to work. The letter also stated that a failure to respond would be considered a voluntary resignation. Farnam did not respond. By a letter dated September 18, 1985, CRISTA acknowledged recognition and acceptance of Farnam's resignation.

Farnam filed suit against CRISTA and individual members of its management staff. She claimed that she had been constructively discharged in retaliation for expressing her religious views and, therefore, was wrongfully discharged in violation of public policy. She also brought

claims for intentional infliction of emotional distress, breach of contract, intentional interference with contractual relations, and religious discrimination. Her husband claimed emotional distress and loss of consortium. His claim was dismissed with prejudice by stipulation of the parties. CRISTA moved for summary judgment, and all of Farnam's claims, except those against CRISTA for discharge in violation of public policy and religious discrimination, were dismissed. The trial court denied reconsideration of the order.

In Farnam's original complaint, she alleged that she was discharged in violation of public policy for expressing her religious views. However, the claim was tried, over CRISTA's objection, on the theory that Farnam was discharged in violation of the public policy set forth in Washington's patient abuse reporting statute, RCW 70.124.

The case was tried to a jury, which returned verdicts for Farnam on both claims and awarded her a total of $100,000, which was not segregated by claim.

CRISTA brought a motion for judgment notwithstanding the verdict or, in the alternative, a new trial. Farnam moved for an award of attorney fees. The trial court reversed and dismissed the religious discrimination by harassment claim, holding that CRISTA was exempt from such claims under RCW 49.60 because it was a religious organization. However, the trial court upheld the jury verdict and award of $100,000 on the claim of wrongful discharge in violation of public policy based on *Thompson v. St. Regis Paper Co.*, 102 Wn.2d 219, 685 P.2d 1081 (1984). The court denied Farnam's motion for attorney fees under RCW 49.48 as not timely pleaded. Farnam moved for reconsideration. The court had initially denied Farnam's motion for attorney fees under RCW 49.60. However, on reconsideration the court concluded that because the jury found that Farnam had been discharged for reporting patient abuse in violation of the public policy supporting the patient abuse reporting statute, RCW 70.124, CRISTA's exemption under RCW 49.60 must yield to the

reporting statute. The court entered judgment on the verdict and awarded Farnam $197,000 additional in costs and attorney fees.

CRISTA filed a notice of appeal to this court. The appeal was granted and Farnam cross–appeals.

## II
### WRONGFUL DISCHARGE

CRISTA appeals the denial of its motion for judgment n.o.v. on Farnam's claim for wrongful discharge in violation of public policy.[1] CRISTA asserts that Farnam was not wrongfully discharged because, as a matter of law, there was no abuse that would have required Farnam to make a report, Farnam's departure from CRISTA was not causally connected to her making a report, and she left voluntarily, she was not discharged.

Farnam contends that she did not leave voluntarily but was constructively discharged because CRISTA made her working conditions intolerable. Further, she argues that the alleged deterioration in her working conditions was a direct result of CRISTA retaliating against her for voicing objections about the removal of NG tubes to her superiors and to Yong Hall, the state long–term care ombudsman. Farnam contends that her constructive discharge was wrongful because it violated public policy as set forth in Washington's patient abuse reporting statute, RCW 70.124.

Generally, where an employment contract is indefinite in duration, either the employer or employee may terminate the contract at will. *Roberts v. ARCO*, 88 Wn.2d 887, 894, 568 P.2d 764 (1977), *cited in Dicomes v. State*,

---

[1] A motion for judgment n.o.v. should not be granted unless, after viewing the evidence in the light most favorable to the party against whom the motion is made, the court can say, as a matter of law, that there is neither evidence nor reasonable inference therefrom sufficient to sustain the verdict. The evidence must be of a character "'which would convince an unprejudiced, thinking mind of the truth of the fact to which the evidence is directed.' A verdict cannot be founded on mere theory or speculation." *Brashear v. Puget Sound Power & Light Co.*, 100 Wn.2d 204, 208–09, 667 P.2d 78 (1983) (quoting *Hojem v. Kelly*, 93 Wn.2d 143, 145, 606 P.2d 275 (1980)).

113 Wn.2d 612, 617, 782 P.2d 1002 (1989). In *Thompson v. St. Regis Paper Co.,* 102 Wn.2d 219, 685 P.2d 1081 (1984), this court recognized a public policy exception to the common law terminable–at–will doctrine. Under *Thompson,* a plaintiff has a cause of action in tort for wrongful discharge if the discharge of the employee contravenes a clear mandate of public policy. *Thompson,* at 232.

> In determining whether a clear mandate of public policy is violated, courts should inquire whether the employer's conduct contravenes the letter or purpose of a constitutional, statutory, or regulatory provision or scheme. Prior judicial decisions may also establish the relevant public policy.

*Thompson,* at 232 (quoting *Parnar v. Americana Hotels, Inc.,* 65 Hawaii 370, 380, 652 P.2d 625 (1982)). The court characterized this exception as a "narrow" one, which "properly balances the interest of both the employer and employee" by protecting against frivolous lawsuits and allowing employers to make personnel decisions without fear of incurring civil liability, while at the same time protecting employee job security against employer actions that contravene a clear public policy. *Thompson,* at 232–33.

In *Dicomes,* this court stated that contravention of a clear mandate of public policy has been found in four general areas:

> (1) where the discharge was the result of refusing to commit an illegal act, *see, e.g, Tameny v. ARCO,* 27 Cal. 3d 167, 164 Cal. Rptr. 839, 610 P.2d 1330 (1980) (termination for refusal to engage in price–fixing); (2) where the discharge resulted due to the employee performing a public duty or obligation, *see, e.g., Nees v. Hocks,* 272 Or. 210, 536 P.2d 512 (1975) (discharge because employee absent from work to serve on jury duty); (3) where the termination resulted because the employee exercised a legal right or privilege, *see, e.g., Kelsay v. Motorola, Inc.,* 74 Ill. 2d 172, 384 N.E.2d 353 (1978) (pursuit of workers' compensation claim); and (4) where the discharge was premised on employee "whistleblowing" activity, *see, e.g., Wagner v. Globe,* 150 Ariz. 82, 722 P.2d 250 (1986).

*Dicomes,* at 618. The court expressly recognized the public policy found in protecting employees who are discharged in retaliation for reporting employer misconduct; *i.e.,* "whistleblowing". In determining if a discharged employee

may state a tort claim for wrongful discharge under this exception, the court examines "the degree of alleged employer wrongdoing, together with the reasonableness of the manner in which the employee reported, or attempted to remedy, the alleged misconduct." *Dicomes,* at 619 (citing 1 L. Larson, *Unjust Dismissal* § 7.02 (1989)). The court expressly declined to limit the scope of what constitutes contravention of public policy to clear statutory violations. *Dicomes,* at 619. A finding that the employer violated either the letter or the purpose of the law is sufficient "so long as the employee sought to further the public good, and not merely private or proprietary interests". *Dicomes,* at 620.

Here, the public policy Farnam relies on to support her wrongful discharge cause of action is found in RCW 70.124. Under RCW 70.124.030, any employee of a nursing home who has reasonable cause to believe that a nursing home patient has suffered abuse or neglect "shall report such incident, or cause a report to be made, to either a law enforcement agency or to the [Department of Social and Health Services]." Abuse or neglect is defined as "the non-accidental physical injury or condition, sexual abuse, or negligent treatment of a nursing home or state hospital patient under circumstances which indicate that the patient's health, welfare, and safety is harmed thereby." RCW 70.124.020(9). Failure to make a report is a misdemeanor, RCW 70.124.070, and it is an unfair practice under RCW 49.60 to dismiss an employee for reporting suspected abuse. RCW 70.124.060.

Because Farnam's concerns focused on the removal of NG tubes, the Natural Death Act (NDA), RCW 70.122, must also be examined in determining if Farnam can state a cause of action. The NDA authorizes the withdrawal of life–sustaining procedures when certain conditions are met and the act's procedural requirements are followed. RCW 70.122.030, .060. Furthermore, RCW 70.122.050 provides immunity for facilities and practitioners who act in good faith in accordance with the requirements of the act.

It is undisputed that CRISTA complied with the procedural requirements of the NDA and that CRISTA believed that removal of NG tubes was provided for under the act. Indeed, Farnam does not contend that CRISTA actually violated any specific provisions of either the reporting statute or the NDA. To the contrary, on April 9, Farnam and other concerned nurses sent a letter to the head of the Board of Trustees of CRISTA, which stated, in part:

> While we realize that *there is legal protection which allows the withdrawal* of hydration and nutrition from our patients, we think that it violates every basic tenet we hold as Christian nurses and which Crista has developed as their image in the care of the elderly.

(Italics ours.) Furthermore, on June 1, 1985, Farnam gave a personal statement to the *ad hoc* committee formed at CRISTA to develop a formal policy regarding the withdrawal of life support systems. Farnam stated, in part:

> [W]e recognize that in some cases patients, families and doctors may choose to make judgments about withholding or withdrawing care *which is their right under current and proposed secular law.* Those individuals now and will continue to have the option to exercise those choices at many other facilities. We will not impose our values on them in such cases. We will in no way interfere with their choice or their rights under secular law. Those who wish to withdraw or withhold care should claim their secular right in a secular facility.

(Some italics ours.)

Thus Farnam twice, while still an employee at CRISTA, stated in writing that she believed CRISTA had the legal right to remove NG tubes under the NDA. A narrow public policy exception intended to protect employees who report employer wrongdoing should not be extended to an employee who has twice told her employer that she believed the actions taken were legally protected.

Farnam also argues that, even though her statements concede that she believed CRISTA acted within the law, she could have believed removal of the NG tubes constituted abuse, which she was required to report, because the NDA does not specifically include or exclude NG tubes

within the definition of life–sustaining procedures that may be withdrawn under the act.[2]

This does not change the result. The focus under the *Dicomes* test for whistleblowing is on CRISTA's level of wrongdoing, not Farnam's actions.

Given CRISTA's undisputed compliance with the procedural requirements of the NDA, CRISTA's good faith belief that NG tube removal was permitted under the NDA, and Farnam's own statements that she believed such removal was permitted, it does not appear that CRISTA's actions rose to the level of wrongdoing that would support a tort of wrongful discharge in violation of public policy. This conclusion is supported by the absence of a finding of abuse or formal action by the Department of Social and Health Services. Indeed, when Hall met with Crandall to review CRISTA's policies on removal of life–sustaining procedures, no mention was made that the removal of the NG tubes might constitute abuse requiring state intervention or formal action.

Farnam's personal statement to the *ad hoc* committee also raises questions about her motive. To state a cause of action, Farnam must have been seeking to "further the public good, and not merely private or proprietary interests". *Dicomes,* at 620. Conduct that may be praiseworthy from a subjective standpoint or may remotely benefit the public will not support a claim for wrongful discharge. *Dicomes,* at 624. While the sincerity of Farnam's belief is

---

[2]RCW 70.122.020(4) provides: "'Life–sustaining procedure' means any medical or surgical procedure or intervention which utilizes mechanical or other artificial means to sustain, restore, or supplant a vital function, which, when applied to a qualified patient, would serve only to artificially prolong the moment of death and where, in the judgment of the attending physician, death is imminent whether or not such procedures are utilized. 'Life–sustaining procedure' shall not include the administration of medication or the performance of any medical procedure deemed necessary to alleviate pain."

Instruction 16 stated, in part: "Washington state law neither expressly or impliedly approved or disapproved the removal of food and water from patients under circumstances referred to in this case."

not questioned, her concern appears to be directed at urging Christian health care providers to adopt her view rather than furthering the public good.

As stated above, in addition to examining the degree of alleged employer wrongdoing, this court must also consider "the reasonableness of the manner in which the employee reported, or attempted to remedy, the alleged misconduct." *Dicomes*, at 619 (citing 1 L. Larson, *Unjust Dismissal* § 7.02 (1989)). Here, while Farnam voiced her objections to CRISTA and the long–term care ombudsman, she also went to the media with her objections, thereby turning the issue of the withdrawal of the two patients' NG tubes into a public controversy. She did this, despite having acknowledged that she believed that CRISTA acted within the law.

In sum, CRISTA's actions do not rise to a level of wrongdoing constituting a violation of a clear mandate of public policy. Because Farnam has not stated a cause of action, we need not decide if CRISTA constructively discharged her.

THE RELIGIOUS EXEMPTION OF RCW 49.60.030

On cross appeal, Farnam assigns error to the trial court's conclusion that because CRISTA is a religious organization, it is exempt from Washington's antidiscrimination laws.[3] Based on this conclusion, the trial court granted CRISTA's motion for a judgment n.o.v. on Farnam's religious discrimination by harassment claim. If the exemption is held to apply, Farnam further argues that CRISTA is estopped from asserting the exemption as a defense and that the exemption violates article 1, section 11 and article 1, section 12 of the Washington Constitution. Our analysis begins with a review of the relevant statutes and the application of

---

[3]CRISTA contends that Farnam's cross appeal should be dismissed as untimely. RAP 5.2(f) requires parties to file cross appeals within "14 days after service by the trial court clerk of the notice filed by [CRISTA]." Farnam states that she received notice from the clerk of court on January 11, 1989. This assertion is supported by the copy of CRISTA's notice of appeal mailed to this court by the King County Court Clerk, which was received on January 10, 1989. Farnam filed her cross appeal on January 24, 1989. Thus, the cross appeal was timely.

the exemption to the present case. Farnam's constitutional claims are then addressed.

RCW 49.60, which is known as the "law against discrimination", is "an exercise of the police power of the state for the protection of the public welfare, health, and peace of the people of this state, and in fulfillment of the provisions of the Constitution of this state concerning civil rights." RCW 49.60.010. The chapter creates a state agency to eliminate and prevent discrimination in a number of areas, including employment. RCW 49.60.010. The provisions of RCW 49.60 "shall be construed liberally for the accomplishment of the purposes thereof." RCW 49.60.020.[4] Under RCW 49.60.040, "employer" is defined as "any person acting in the interest of an employer, directly or indirectly, who employs eight or more persons, and does not include any religious or sectarian organization not organized for private profit". Thus, if CRISTA is a nonprofit, religious organization, it is exempt from the provisions of this chapter.

Farnam does not argue directly that CRISTA is not an exempt religious organization. Rather, she contends that the exemption does not apply in the present action because it does not extend to CRISTA's subdivisions, such as the nursing home, unless that subdivision also serves a religious purpose. Under Farnam's reasoning, a separate inquiry must be made to determine if a facility run by a religious organization is itself exempt, regardless of the status of the umbrella organization. Farnam relies on two Washington cases, *Yakima First Baptist Homes, Inc. v. Gray,* 82 Wn.2d 295, 510 P.2d 243 (1973) and *Hazen v. Catholic Credit*

---

[4]Because the statutory protections against discrimination are to be liberally construed, exceptions should be narrowly confined. *Phillips v. Seattle,* 111 Wn.2d 903, 908, 766 P.2d 1099 (1989). However, the religious exemption has been a part of this statute since it was enacted. RCWA 49.60.040, Historical Note, at 268. Furthermore, the religious exemption has never been amended, although the section in which it is contained has been amended many times. (Amendments to the section were made in 1957, 1961, 1969, 1973, 1979, and 1985.) Also, the Legislature has twice declined to narrow or delete the exemption. *See* Senate Bill 2482, 45th Legislature (1977) and Senate Bill 4623, 48th Legislature (1984).

*Union,* 37 Wn. App. 502, 681 P.2d 856, *review denied,* 102 Wn.2d 1003 (1984) to assert that the statute requires facilities run by religious organizations to meet a separate "purpose" test. Farnam's reliance on these cases is misplaced.

The exemption at issue in *Gray* was a property tax exemption, which was to be "construed strictly against the claim of exemption." *Gray,* at 299. The exemption provides:

> Property owned by nonsectarian organizations or associations, organized and conducted primarily and chiefly for religious purposes and not for profit, *which shall be used, or to the extent solely used, for the religious purposes* of such associations, or for the educational, benevolent, protective, or social departments growing out of, or related to, the religious work of such associations[.]

(Italics ours.) *Gray,* at 301. Thus, the use to which a specific piece of property is put determines whether or not the exemption applies to that piece of property, even if the property is owned by a religious organization. RCW 49.60-.040 contains no such use or purpose restriction applicable to facilities run by religious organizations. *Gray* is of limited assistance here.

*Hazen* is the only Washington case to have directly addressed the circumstances under which an organization would be religious for purposes of the exemption of RCW 49.60. There, the court held that a Catholic Credit Union was not a religious or sectarian organization and was subject to RCW 49.60 as a matter of law. In so holding, the court noted that while the credit union "was founded in the 1950's in connection with a popular trend in the Roman Catholic Church to financially aid members" and all of the incorporators were Catholic laymen, its purpose, as set forth in its bylaws, was to promote thrift and create a source of credit. *Hazen,* at 503–04. Membership was not limited to Catholics, but was open to all parishioners and all employees of Catholic institutions, employees of the credit union, and family members of members in good standing. Moreover, the credit union had no organizational, structural, financial ties to the Roman Catholic Church and loans made to parishes were made on the same terms as to

individuals. The credit union did not report to, or receive input from, the Diocese of Yakima. Members of the board of directors were selected based on their financial, business and management skills, not religious qualifications. *Hazen,* at 504. No member of the Catholic clergy had ever served as a director and if one were to serve, the selection would be based on that clergy's business and financial skills, not his religious contribution. *Hazen,* at 504. Similarly, employees were hired on the basis of their ability, not their religious affiliation. The court also noted that the credit union did not provide religious counseling, with the only prayers taking place at the opening and closing of meetings. The court stated that the credit union advertised itself as a financial institution and operated as any other credit union organized under Washington law. *Hazen,* at 505.

Because the statute does not define religious or sectarian organization, the court construed those terms according to their ordinary meaning and stated that it "[did] not believe promoting thrift and providing a source of credit are manifestations of devotion to a superior being in a religious sense." *Hazen,* at 506. The court went on to cite *Gray*'s holding that care of the aged is not a religious purpose within the tax exemption provided to organizations conducted for religious purposes. *Hazen,* at 506. By making reference to *Gray, Hazen* appears to have unnecessarily incorporated *Gray*'s discussion of specific purpose under the tax statute into the exemption of RCW 49.60.

With the exception of this unnecessary reference to *Gray, Hazen* does not support Farnam's position. Indeed, *Hazen* is readily distinguishable in that the court was not called upon to determine if a subdivision of a religious organization comes within the exemption. *Hazen*'s inquiry was limited to the credit union itself. There is nothing in *Hazen* that requires this court to make a separate determination of the nursing home's status as a religious organization based on an independent religious purpose.

In addition to *Gray* and *Hazen,* Farnam relies on *Equal Empl. Opportunity Comm'n v. Townley Eng'g &*

*Mfg. Co.,* 859 F.2d 610 (9th Cir. 1988), *cert. denied,* 489 U.S. 1077 (1989) to argue that, regardless of CRISTA's status, the nursing home must have a religious purpose for the exemption to apply.[5] As Farnam points out, because RCW 49.60 substantially parallels the federal law against discrimination, Title 7 of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.,*[6] Washington courts have looked to the interpretation of the federal law in construing RCW 49.60. *Selberg v. United Pac. Ins. Co.,* 45 Wn. App. 469, 726 P.2d 468, *review denied,* 107 Wn.2d 1017 (1986); *Hollingsworth v. Washington Mut. Sav. Bank,* 37 Wn. App. 386, 390, 681 P.2d 845 (citing *Davis v. Department of Labor & Indus.,* 94 Wn.2d 119, 125, 615 P.2d 1279 (1980)), *review denied,* 103 Wn.2d 1007 (1984). However, federal law does not support Farnam's position. Under federal law, all of CRISTA's activities, including the nursing home, clearly would fall within the religious organization exemption.

In *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos,* 483 U.S. 327, 97 L. Ed. 2d 273, 107 S. Ct. 2862 (1987), the Supreme Court held that applying the exemption of section 702 of Title 7, 42 U.S.C. § 2000e–1 to a religious organization's secular activities did not violate the Establishment Clause of the first amendment to the United States Constitution. *Amos,* at 330. The Supreme Court noted that the District Court had "considered and rejected the possibility that § 702

---

[5]In *Townley,* as in *Hazen,* the court was not called upon to determine if a facility run by a religious organization fell within the exemption. Thus, *Townley* is distinguishable. In its brief, amici on behalf of the American Civil Liberties Union of Washington Foundation also relies on *Gray, Hazen,* and *Townley* to argue that the nursing home must have a religious purpose for the religious exemption to apply in this case.

[6]The parallel to RCW 49.60.040 is found at 42 U.S.C. § 2000e–1, which states that the provisions of that act "shall not apply to . . . a religious corporation, association, educational institution, or society with respect to the employment of individuals of a particular religion to perform work connected with the carrying on by such corporation, association, educational institution, or society of its activities."

could be construed to exempt a religious organization only with respect to employment involving religious activities." *Amos*, at 332 n.8. The Court cited with approval the District Court's conclusion that such a construction was not consistent with the legislative history of the exemption, which prior to 1972 had exempted only the religious activities of religious organizations, but had been amended in 1972 to extend the exemption to all activities of religious organizations. *Amos*, at 332 n.9. Because the federal religious exemption, unlike RCW 49.60.030, expressly extends to all activities of a religious organization, reference to federal law in this case is less than helpful.

In sum, neither the language of RCW 49.60 nor the case law cited by Farnam requires this court to make a separate determination of the nursing home's status as a religious organization based on an independent religious purposes. Our inquiry is properly limited to CRISTA's status as a religious organization. *Hazen*'s consideration of the entire factual context of the case, including the stated purpose of the credit union, is instructive in this regard.

In its articles of incorporation, CRISTA's purpose is, in part:

> To engage in, foster, encourage, promote, and propagate evangelical churches and missions, and Christian and charitable interests . . . [and to] use every method such as radio, telephone, pictures, literature, and the spoken word, et cetera, that the people of the World may hear the Gospel and accept Christ as their own personal saviour.

CRISTA's bylaws state, in part:

> CRISTA MINISTRIES has been created and exists as a Christian organization for the purpose of ministering as "Christianity–In–Action." CRISTA shall seek and provide opportunities to demonstrate Christ's love by maintaining and operating a non–profit organization which actively provides appropriate avenues of Christian service to accomplish that mission. CRISTA MINISTRIES shall be enabled by a gathering of Christian people from all walks of life for this purpose, working together to change lives by doing Christ's work in today's world.

Both the bylaws and CRISTA's Staff Information Manual contain a Statement of Faith. The Staff Information Manual also provides, in part:

> CRISTA Ministries . . . is a professionally staffed, nonprofit organization engaged in a growing ministry of diverse Christian, humanitarian and community services designed to meet the needs of the whole person . . . physical, intellectual and spiritual.

The Mission Statement for the nursing staff provides, in part:

> We, as Christian nurses are accountable to God and responsive to Him for the contribution we make to the development of the nursing profession, to the care of residents and to the support of their families. We offer ourselves to the Lord so that His love may flow through us as we exercise our ministry to His honor and glory.

All CRISTA employees must sign a doctrinal statement and adhere to CRISTA's Statement of Faith. CRISTA begins most days with devotions and prayers. CRISTA's schools offer on–campus Bible classes, the Senior Community has vesper services, and there are two chaplains on staff. CRISTA's brochures express Christian values. While CRISTA is interdenominational, and not affiliated with a particular church, Farnam concedes that such affiliation is not required by the statute, but is rather one of the factors to be considered.

The facts before us readily support the conclusion that CRISTA is a religious organization within the exemption of RCW 49.60.040. Accordingly, we affirm the trial court's granting of CRISTA's motion for judgment n.o.v. on Farnam's religious discrimination by harassment claim.

Farnam also argues that, even if CRISTA is a religious organization, it is equitably estopped from asserting the religious organization exemption defense under RCW 49.60. However, the doctrine of estoppel does not apply.

■ Estoppel has three elements:

> (1) an admission, statement, or act inconsistent with the claim afterwards asserted, (2) action by the other party on the faith of such admission, statement, or act, and (3) injury to such

other party resulting from allowing the first party to contradict or repudiate such admission, statement, or act.

*Saunders v. Lloyd's of London,* 113 Wn.2d 330, 340, 779 P.2d 249 (1989) (quoting *McDaniels v. Carlson,* 108 Wn.2d 299, 308, 738 P.2d 254 (1987)). Estoppel focuses on the justified reliance of the person asserting it. *Saunders,* at 340.

It is undisputed that CRISTA at all times held itself out to Farnam as a religious organization and never represented to her that it would not assert the exemption. Furthermore, it is clear from the personal statement Farman submitted to the *ad hoc* committee that she believed that CRISTA was a Christian organization. Therefore, the doctrine of estoppel does not apply.

Farnam next argues that the exemption for religious organizations contained in RCW 49.60 is unconstitutional under article 1, section 11 (freedom of belief) and article 1, section 12 (privileges and immunities) of the Washington Constitution. She has expressly declined to bring any federal constitutional challenges. For the reasons discussed below, we decline to reach Farnam's state constitutional claims.

■ Farnam argues that the religious exemption violates the absolute freedom of conscience and religious belief guaranteed by article 1, section 11 by allowing employers to discriminate on the basis of religion. However, while she raises her claims under the Washington Constitution, the cases she cites in support of her argument, *State v. Meacham,* 93 Wn.2d 735, 612 P.2d 795 (1980) and *Backlund v. Board of Comm'rs of King Cy. Hosp. Dist. 2,* 106 Wn.2d 632, 724 P.2d 981 (1986), were decided under the First Amendment to the federal constitution. Significantly, in *Backlund,* this court declined to decide the issue under the Washington Constitution because "[t]he parties [did not argue] persuasively for a different application of the provisions of the First Amendment and Const. art. 1, § 11 (amend. 34) of the state constitution . . .". *Backlund,* at 639 n.3. While *Backlund* went on to apply a First Amendment analysis, it would not be appropriate to do so in this

case because Farnam has expressly declined to raise a First Amendment challenge. Thus, this court is faced with deciding an issue under our constitution without benefit of citation to appropriate supporting authority. This we decline to do. *Accord, Spokane v. Taxpayers of Spokane,* 111 Wn.2d 91, 96, 758 P.2d 480 (1988) (constitutional issues not adequately briefed will not be considered by this court).[7]

Farnam also asserts that the exemption of RCW 49.60 violates the privileges and immunities clause, article 1, section 12 of the Washington Constitution, because it creates two classes of workers—those who work in secular nursing homes and those who work in religious nursing homes—with protection against discrimination only available to the former.

█ Farnam relies on *Duranceau v. Tacoma,* 27 Wn. App. 777, 620 P.2d 533 (1980), to argue that strict scrutiny must be applied to the exemption because the right to private employment is a fundamental right. However, in *Duranceau,* the court stated that "[t]he right to hold specific private employment free from *unreasonable government interference* is a fundamental right". (Italics ours.)

---

[7]In connection with her article 1, section 11 argument, Farnam uses the words "constitutionally overbroad". However, she does so in the context of whether or not the exemption is the least restrictive alternative available to achieve the State's interest in avoiding governmental intrusion into the running of religious organizations. She does not make a separate argument that the exemption is constitutionally overbroad. Nor does she cite any authority to support such an argument.

Farnam also contends that the trial court erred in rejecting her claim that CRISTA had violated her constitutional guaranty of freedom of belief under article 1, section 11. However, we do not reach this issue because she did not seek to overturn the jury verdict for CRISTA on the issue of religious discrimination. The jury entered a verdict for Farnam based on a finding of religious discrimination by harassment. In response to the question, "Did plaintiff prove, by a preponderance of the evidence, religious discrimination, and did defendant not carry its burden of proof regarding reasonable accommodations as defined in instruction No. 10?", the jury answered, "No". Furthermore, she did not assign error to the trial court's finding, made in connection with Farnam's motion for reconsideration, that "Crista's actions did not violate the Washington State Constitution because Mrs. Farnam was constructively discharged for her actions, not for her beliefs."

*Duranceau,* at 780. In that case, the City of Tacoma interfered with Duranceau's right to work by denying him access to a city–controlled road. Here, there is no governmental interference. Thus, *Duranceau* is inapposite.

Because *Duranceau* forms the basis of Farnam's argument, it would be inappropriate to decide this issue on the briefing before us. Therefore, we decline to reach the issue of the constitutionality of the exemption under article 1, section 12. However, it is worth noting that a similar challenge to the federal exemption was specifically rejected under the equal protection clause of the Fourteenth Amendment. In *American Networks, Inc. v. Utilities & Transp. Comm'n,* 113 Wn.2d 59, 77, 776 P.2d 950 (1989), this court stated:

> The privileges and immunities clause of the Washington State Constitution (article 1, section 12) and the equal protection clause of the Fourteenth Amendment are substantially identical and have been considered by this court as one issue.

In *Corporation of the Presiding Bishop of the Church of Jesus Christ of Latter–Day Saints v. Amos,* 483 U.S. 327, 97 L. Ed. 2d 273, 107 S. Ct. 2862 (1987), the Court held that the federal counterpart to Washington's religious exemption does not violate the equal protection clause of the Fourteenth Amendment because it was rationally related to the legitimate governmental purpose of alleviating significant governmental interference with the exercise of religion. *Amos,* at 339. Further, the Court stated that there was no merit to the argument that strict scrutiny was required because the exemption was drawn on religious grounds. While laws discriminating *among* religions are subject to strict scrutiny, laws affording a uniform benefit to *all* religions need only satisfy the rational relationship test. *Amos,* at 339.

### III

In sum, we hold that Farnam has not stated a cause of action for wrongful discharge in violation of public policy. We also hold that CRISTA is a religious organization within the exemption of RCW 49.60.030 and is not

estopped from asserting the exemption as a defense. Accordingly, we reverse the trial court's dismissal of CRISTA's motion for judgment n.o.v. as to the wrongful discharge in violation of public policy claim, and we reverse the award of attorney fees based thereon. We affirm the trial court's dismissal of Farnam's religious discrimination by harassment claim.[8]

UTTER, BRACHTENBACH, DOLLIVER, ANDERSEN, and GUY, JJ., and CALLOW, J. Pro Tem., concur.

DORE, C.J. (concurring in part, dissenting in part)—The majority downplays the dissent as irrelevant, saying that:

> The dissent's unwarranted foray into the emotionally charged theater of bio-ethics is as dangerous as it is irrelevant. Termination of life support is one of the most complex issues of our time and demands thoughtful and informed analysis. Neither the trial judge nor the parties dealt with this issue, and it has not been presented to this court. As such, it has no place in this case.

Majority, at 662.

I disagree. Both parties addressed the Natural Death Act, the issue of nutrition and hydration removal, and *In re Grant,* 109 Wn.2d 545, 747 P.2d 445, 757 P.2d 534 (1987), in their briefs.[9] Nancy Farnam explained in her August 23, 1989, statement of grounds for direct review,

> This case certainly involves a fundamental and urgent issue of broad public importance which requires prompt and ultimate determination by the Washington Supreme Court. The case presents a question of first impression as to whether or not the withdrawal of artificial nutrition and hydration to a terminally ill patient could constitute patient abuse . . ..

---

[8]CRISTA also assigns error to certain jury instructions, to the trial court's ruling admitting evidence of CRISTA's offer of severance pay to Farnam, and to the trial court's award of attorney fees to Farnam. Because we hold for CRISTA on both claims, we do not reach these issues. For the same reason, we do not reach Farnam's assignment of error to the trial court's denial of fees under RCW 49.48-.030 as not timely pleaded.

[9]Brief of Appellant, at 28–35. Brief of Respondents, at 39–44.

In oral argument, both parties asserted that CRISTA's policies complied with the law as stated in *In re Colyer,* 99 Wn.2d 114, 660 P.2d 738 (1983), and that nutrition and hydration could be legally withdrawn from terminally ill patients.

Although CRISTA's acts may have complied with the law at that time, that was before *Grant. Grant* set this issue to rest: The removal of nutrition and hydration is not life–sustaining procedure within the Natural Death Act or the *Colyer* decision; rather, it is illegal and contrary to public policy. The majority properly interprets key issues in this case; however, by not addressing the nutrition and hydration issue, it implies that the removal of such essential care is legal. I take strong exception to this statement. This dissent supplements the majority opinion by clarifying our position in *In re Grant, supra,* which the majority avoided or failed to do.

### ANALYSIS

I concur with that part of the majority opinion recognizing Nancy Farnam's failure to state a cause of action for wrongful discharge in violation of public policy. CRISTA Ministries acted in good faith and, under current interpretation of the law, undisputedly complied with the procedural requirements of the Natural Death Act. RCW 70.122. CRISTA also fell within the broad religious organization exemption under Washington State law. RCW 49.60.040. The majority opinion, however, is premised on the assumption that the removal of nutrition and hydration from terminally ill, incompetent persons is sanctioned under the Natural Death Act. That premise is incorrect.

### THE NATURAL DEATH ACT

In 1979, the Washington State Legislature, recognizing that medical technology was capable of prolonging human life beyond the natural moment of death, enacted the Natural Death Act. The Natural Death Act permits the

withdrawal of "'[l]ife–sustaining procedure[s]'" from quali-
fied, terminally ill patients. "'Life–sustaining procedure[s]'"
include:

> any medical or surgical procedure or intervention which utilizes
> mechanical or other artificial means to sustain, restore, or sup-
> plant a vital function, which, when applied to a qualified
> patient, would serve only to artificially prolong the moment of
> death and where, in the judgment of the attending physician,
> death is imminent whether or not such procedures are utilized.
> "Life–sustaining procedure" shall not include the administra-
> tion of medication or the performance of any medical proce-
> dure deemed necessary to alleviate pain.

RCW 70.122.020(4). A qualified patient is a competent,
terminally ill patient or an incompetent, terminally ill
patient having issued a directive, before becoming incom-
petent, which indicated a desire to forgo treatment. RCW
70.122.020(6). A patient is considered terminally ill if
judged by two physicians to be afflicted with, "an incurable
condition caused by injury, disease, or illness, which,
regardless of the application of life–sustaining procedures,
would, within reasonable medical judgment, produce death
. . .." RCW 70.122.020(7).

In 1983, we affirmed the terminally ill patient's right to
refuse medical treatment under the Natural Death Act. *In
re Colyer,* 99 Wn.2d 114, 660 P.2d 738 (1983). In *Colyer,* we
approved the removal of artificial life support from a term-
inally ill, incompetent patient. We based our decision on
the constitutional right to privacy and the common law
right to be free from bodily invasion. We rejected, however,
the view that the right to refuse treatment was absolute. 99
Wn.2d at 122. Instead, we balanced the invasiveness of the
treatment, the prognosis of the patient, and the presence of
state interests that might outweigh the patient's right to
refuse treatment. These state interests included: (1) the
preservation of life; (2) the prevention of suicide; (3) main-
taining the integrity of the medical profession, and (4) the
protection of third party interests. I agreed with the major-
ity's affirmation of the right to refuse treatment in *Colyer.* I
disagreed, however, with the designated waiting period of

only 25 days before life support could be removed. I believed this period was insufficient to ensure an accurate determination of the patient's chances for recovery. 99 Wn.2d at 146. In 1984, we affirmed and broadened the right to refuse treatment by allowing a guardian to refuse treatment on behalf of a terminally ill, incompetent person. *In re Hamlin*, 102 Wn.2d 810, 689 P.2d 1372 (1984). In *Hamlin*, I argued against the majority's analysis which circumvented the regular court appointed guardian proceedings and negated the safeguards inherent in the guardian statutes. In both *Hamlin* and *Colyer*, I dissented not from the basic right of a person, incompetent or not, to refuse medical treatment, but rather from the implementation of inadequate procedural safeguards for what is obviously a practice of grave consequence. Although these cases established the parameters and procedural requirements of the Natural Death Act, it was not until later that we addressed the nutrition and hydration removal issue.

In 1987, this court held that the removal of nutrition and hydration did not fall within the meaning of life–sustaining treatment under the Natural Death Act. *In re Grant*, 109 Wn.2d 545, 747 P.2d 445, 757 P.2d 534 (1987). In *Grant*, only four justices concurred in the lead opinion. They held that an incompetent person's family had the right to remove nutrition and hydration. A majority of five justices, however, held that the removal of nutrition and hydration was euthanasia of a cruel nature, raised complex policy issues, and necessitated deferral to the Legislature.[10]

Justice Andersen, with Justices Brachtenbach and Durham concurring, agreed that an incompetent person's family could make decisions regarding life support, but forcefully dissented from the lead opinion's subscription to the removal of nutrition and hydration:

---

[10]The original *In re Grant* slip opinion presented a 5–justice majority opinion yielding a 5–2–2 decision. The later, mandated decision, however, contained a 4–3–2 tally of justices after Justice Durham altered her stance and joined with Justice Andersen's concurrence/dissent.

> I disagree . . . with the . . . decision which allows the patient's life to be taken by withholding intravenous nutrition and hydration or, to use less polite phraseology, to let her die of thirst or starvation. Call it whatever the majority will, this is pure, unadorned euthanasia.

109 Wn.2d at 570. Justice Andersen noted that recent legislative attempts to authorize the removal of nutrition and hydration had failed. During the 1987 session, Engrossed Substitute Senate Bill 5401, which authorized the discontinuance of artificial nutrition and hydration, failed after heated debate.[11] 109 Wn.2d at 572. Justice Andersen emphasized the Legislature's superior ability to evaluate such far–reaching public policy issues and felt that the issue should be deferred until the Legislature resolved it.

Justice Goodloe and I agreed that the right to "face an inevitable and imminent death in a manner most consistent with our beliefs and with our dignity as humans is vital." 109 Wn.2d at 575. We dissented, however, from both the majority's holding authorizing the removal of nutrition and hydration, and its holding enabling an incompetent person's family to make such decisions on behalf of the patient. We believed that allowing the removal of nutrition and hydration flew in the face of both the Natural Death Act and natural law:

> This result is contrary to the legislative dictates of the NDA [Natural Death Act]. . . . [T]he unfortunate result of the majority opinion is that the potential for abuse is increased. . . . [B]y authorizing the withholding of intravenous nutrition and hydration, the majority authorizes death by starvation and dehydration. . . .[,] authorizes mercy killing, arguably of a cruel nature. . . .
>
> . . . .
> . . . [and] fails to give appropriate weight to the State's interest in preserving life—whether that of the particular patient, or the sanctity of all human life in general.

109 Wn.2d at 576, 580. We noted recent legal and scholarly debate on the issue of nutrition and hydration removal. 109

---

[11]*See* H.R. Rep., 50th Legislature (1987), at 2. *See also* Senate and House versions of Engrossed Substitute Senate Bill 5401, 50th Legislature (1987), at 3, lines 10–12.

Wn.2d at 579. We argued that the existence of both the right to withhold nutrition and hydration, and the right of a guardian to exercise this power on behalf of an incompetent patient, was a question best left to the Legislature. We recalled Engrossed Substitute Senate Bill 5401, which would have established these rights, and objected to the majority's circumventing a straightforward legislative failure, "imposing its own morality on the public in extending a legislative act . . . [and] establishing philosophical principles in the guise of constitutional interpretation." 109 Wn.2d at 579–80. Like Justice Andersen, we emphasized that the Legislature was the only appropriate lawmaking body.

Thus in *Grant,* although seven justices held that an incompetent person's family should be allowed to make decisions regarding the removal of life support, a 5–justice majority qualified this holding and agreed that the removal of nutrition and hydration was a particularly cruel method of euthanasia, inapplicable under the Natural Death Act and meriting deferral to the Legislature for a proper evaluation of public policy.

Other states have experienced difficulty resolving the issue of nutrition and hydration removal as well. A New York court declined to authorize the removal of nutrition and hydration, which it viewed as ordinary care of a "passive and less intrusive" nature, because it reasoned that death should occur naturally from the patient's own untreated illness, rather than any act of either commission or omission.[12] A Massachusetts court upheld a hospital's refusal to withdraw a persistently vegetative patient's artificial sustenance, but allowed the patient to move to an institution which would comply with his wishes.[13] Conversely, numerous state courts authorize the removal of

---

[12]*In re Workmen's Circle Home & Infirmary for the Aged v. Fink,* 135 Misc. 2d 270, 514 N.Y.S.2d 893, 895 (N.Y. Sup. Ct. 1987).

[13]*Brophy v. New England Sinai Hosp., Inc.,* 398 Mass. 417, 497 N.E.2d 626 (1986).

nutrition and hydration. These courts contend that a right to refuse nutrition and hydration, like the right to refuse artificial ventilation, derives from the substantive due process right to privacy, as well as the common law right to be free from bodily intrusion. *In re Grant,* 109 Wn.2d 545, 562, 747 P.2d 445, 757 P.2d 534 (1987). The United States Supreme Court, however, doubts the validity of such a contention.

### FEDERAL LAW

The United States Supreme Court recently stated that the medical implications of discontinuing nutrition and hydration may raise a constitutional question about the existence of the right to refuse such treatment. *Cruzan v. Director, Mo. Dep't of Health,* ___ U.S. ___, 111 L. Ed. 2d 224, 110 S. Ct. 2841 (1990). In *Cruzan,* the Court examined whether the constitution prohibited the State of Missouri from imposing a "clear and convincing" evidence standard on an incompetent person's right to forgo treatment in order to ensure an accurate determination of the person's wishes. The petitioners in *Cruzan* insisted that the forced administration of life–sustaining medical treatment, including artificially delivered food and water, implicated an incompetent person's liberty interest which could not be deprived without due process of law. 110 S. Ct. at 2852. They further contended that the imposed evidentiary standard virtually eliminated an incompetent's right to forgo treatment, except in rare instances where that intent had been expressed before the onset of incompetency. 110 S. Ct. at 2851.

Although the *Cruzan* majority assumed arguendo that a competent person's liberty interest embraced the right to refuse unwanted artificial nutrition and hydration, the Court emphasized that this assumption was only for purposes of the case before it. The majority admonished, "the dramatic consequences involved in refusal of such treat-

ment would inform the inquiry as to whether the deprivation of that interest is constitutionally permissible."[14] 110 S. Ct. at 2852. The Court held in favor of the State and affirmed the State's right to require "clear and convincing evidence". It reasoned that where uncertainty existed as to an incompetent person's wish to die, the State's cautious approach was merited because only the choice that sustained life could be reversed upon the discovery of conclusive evidence.[15] 110 S. Ct. at 2853.

Justice Scalia agreed in the result, but filed a concurring opinion which addressed the removal of nutrition and hydration at length. He pointed out that the petitioners' "substantive due process" claim could not be maintained without demonstrating that the State had deprived the claimant of a right "historically and traditionally protected against State interference." 110 S. Ct. at 2860. By challenging the petitioners' rationale distinguishing the abstention of such treatment from suicide, Justice Scalia asserted that such a right could not possibly be established in the case at hand.

---

[14]It is noteworthy that both parties in *Cruzan* interpreted *Grant* as clearly holding that nutrition and hydration removal is euthanasia and therefore illegal. See Petition for Writ of Certiorari to the Missouri Supreme Court, at 15–16 (*Cruzan*); Brief in Opposition, at 15–16 (*Cruzan*).

[15]The Court then essentially allowed Missouri to restrict that right to competent persons.

> Missouri has in effect recognized that under certain circumstances a surrogate may act for the patient in electing to have hydration and nutrition withdrawn in such a way as to cause death, but it has established a procedural safeguard to assure that the action of the surrogate conforms as best it may to the wishes expressed by the patient while competent. Missouri requires that evidence of the incompetent's wishes as to the withdrawal of treatment be proved by clear and convincing evidence. The question, then, is whether the United States Constitution forbids the establishment of this procedural requirement by the State. We hold that it does not.

110 S. Ct. at 2852. The Court reasoned that the most cautious approach would be to allow the patient to live until evidence was obtained proving the incompetent's wishes in accordance with the clear and convincing standard imposed by Missouri law.

> Petitioners rely on three distinctions to separate Nancy Cruzan's case from ordinary suicide: (1) that she is permanently incapacitated and in pain; (2) that she would bring on her death not by any affirmative act but by merely declining treatment that provides nourishment; and (3) that preventing her from effectuating her presumed wish to die requires violation of her bodily integrity. None of these suffices.

110 S. Ct. at 2860. Justice Scalia easily dismissed petitioners' first argument by pointing out that a person's incapacitation and pain have no bearing on the State's interest in preventing that person's suicide. Quoting 4 W. Blackstone, *Commentaries* *189, Justice Scalia reasoned, "[s]uicide was not excused even when committed 'to avoid those ills which [persons] had not the fortitude to endure.'" 110 S. Ct. at 2860. He then attacked the petitioners' second line of reasoning, the action/inaction distinction. "It would not make much sense to say that one may not kill oneself by walking into the sea, but may sit on the beach until submerged by the incoming tide . . .." 110 S. Ct. at 2861. Rather than adopt the action/inaction distinction, Justice Scalia reasoned that the "intelligent line" fell between those forms of inaction abstaining from ordinary care and those abstaining from "heroic" or "excessive" care. 110 S. Ct. at 2861. Justice Scalia cautioned that, unlike the action/inaction distinction, the ordinary/heroic care distinction was not a bright–line analysis. Once again quoting Blackstone, Justice Scalia reiterated that

> [s]tarving oneself to death is no different from putting a gun to one's temple as far as the common–law definition of suicide is concerned; the cause of death in both cases is the suicide's conscious decision to 'pu[t] an end to his own existence.'"

110 S. Ct. at 2861. He insisted that imposing treatment on a patient who wished to die did not violate a person's bodily integrity and reminded us that, at common law, even a private person was justified in the use of force to prevent suicide. 110 S. Ct. at 2862. Justice Scalia concluded that although there exist limits that "ought not to be exceeded in requiring an individual to preserve his own life", such

limits are not set out in the due process clause and, therefore, should not be set by the Court. 110 S. Ct. at 2863.

The majority opinion in *Cruzan,* along with Justice Scalia's concurrence, make it clear that the existence of the right to refuse nutrition and hydration under the federal constitution is a question open for debate. Further, it is clear that the creation of such a right is not the privilege of the Court. As Justice Scalia noted in his conclusion, his point was not that Nancy Cruzan should remain alive, even if knowledge of her wish to die were certain, but rather that the constitution had nothing to say on the subject and, therefore, the Court should not either.[16]

> This Court need not, and has no authority to, inject itself into every field of human activity where irrationality and oppression may theoretically occur, and if it tries to do so it will destroy itself.

110 S. Ct. at 2863. The same reasoning is true and applies in Washington State.

## NATURAL DEATH OR EUTHANASIA?

Washington's Natural Death Act does not permit the removal of nutrition and hydration from terminally ill patients. Nothing in the Natural Death Act suggests that

---

[16]Justice Scalia compared *Cruzan* to the Court's recent decision in *Webster v. Reproductive Health Servs.,* 492 U.S. 490, 106 L. Ed. 2d 410, 109 S. Ct 3040 (1989).

> I am concerned, from the tenor of today's opinions, that we are poised to confuse that enterprise as successfully as we have confused the enterprise of legislating concerning abortion—requiring it to be conducted against a background of federal constitutional imperatives that are unknown because they are being newly crafted from Term to Term. That would be a great misfortune.

110 S. Ct. at 2859. Justice Scalia further asserted:

> [I]t is up to the citizens of Missouri to decide, through their elected representatives, whether that wish will be honored. It is quite impossible (because the Constitution says nothing about the matter) that those citizens will decide upon a line less lawful than the one we would choose; and it is unlikely (because we know no more about "life–and–death" than they do) that they will decide upon a line less reasonable.

110 S. Ct. at 2859.

such basic treatment falls within the ambit of "life–sustaining procedure". In fact, upon close examination, the language of the Natural Death Act suggests the opposite.[17]

The concept of "natural death" itself suggests a death caused by neither act nor omission, but rather by the patient's own unimpeded illness. Under this reasoning, only the removal of treatment directly addressing a terminal condition could be congruent with the Natural Death Act. The provision of food and water, however, certainly does not combat a terminal affliction. The withdrawal of food and water causes a premature unnatural death. To say a person died naturally because of an inability to feed oneself is absurd. Such logic could support the withdrawal of treatment from unwanted babies, the handicapped or the developmentally disabled.

Using this reasoning, the New York Court of Appeals disallowed the termination of blood transfusions that were administered to a terminally ill, profoundly retarded patient. *In re Storar,* 52 N.Y.2d 363, 420 N.E.2d 64, 438 N.Y.S.2d 266 (1981). In *Storar,* the court found it "unrealistic to attempt to determine whether [the patient] would want to continue potentially life prolonging treatment if he were competent." Instead, the court likened the developmentally disabled patient's condition to that of an infant and held that a guardian "may not deprive a child of life-saving treatment, however well intentioned." (Citations omitted.) 52 N.Y.2d at 380. The court further reasoned that the "transfusions were analogous to food—they would not cure the cancer, but they could eliminate the risk of death from another treatable cause." 52 N.Y.2d at 381. The Court of Appeals, therefore, reversed the lower court decision to

---

[17]Numerous scholarly articles address the subject of whether nutrition and hydration constitute withholdable, ordinary care or nonwithholdable heroic, extraordinary care. *See* Note, In re Grant: *Where Does Washington Stand on Artificial Nutrition and Hydration?,* 13 U. Puget Sound L. Rev. 197 (1989); Comment, *Artificial Nutrition and the Terminally Ill: How Should Washington Decide?,* 61 Wash. L. Rev. 419 (1986); Horan & Grant, *The Legal Aspects of Withdrawing Nourishment,* 5 J. Legal Med. 595 (1984).

withhold the blood transfusions. The Court of Appeals did, however, authorize the lower court's holding permitting the removal of artificial ventilation. 52 N.Y.2d at 381. In doing so, it implicitly recognized the difference between extraordinary care, such as ventilation, and basic care, such as the provision of food.[18] This court should plainly recognize the same today, that the provision of food and water is simply the most basic care, the withdrawal of which would certainly not cause a "natural death."

It is openly accepted that "life–sustaining treatment" was not meant to include basic, ordinary medical care. What could be more basic than feeding a patient? Proponents of withholding nutrition and hydration often argue that physicians equate such treatment with extraordinary methods of life support such as ventilation. This statement, however, cannot speak for the medical profession as a whole. Many physicians reasonably and genuinely believe that nutrition and hydration are not life–sustaining treatment within the Natural Death Act, but rather typify the administration of intimate care necessary to maintain patient comfort, essential to the doctor–patient relationship.[19] The fact is that artificial nutrition and hydration are different from other forms of treatment, just as eating and drinking are different from breathing or, for example, the blood–cleansing function of kidneys. Whereas, eating and drinking are voluntary functions, breathing and blood cleansing are reflexive, involuntary functions. At various times in our lives we are unable to feed ourselves. It is a fact of human life that we are fed as helpless, newborn infants and often as helpless invalids. The inability to breathe or cleanse blood, however, merits extraordinary or heroic measures such as artificial

[18]The patient died of cancer before the case could be resolved, but the court found the underlying issue of overriding public importance and addressed the case despite its mootness. 52 N.Y.2d at 381.

[19]Seigler & Weisbard, *Against the Emerging Stream: Should Fluids and Nutritional Support Be Discontinued?*, 145 Archives Internal Med. 129, 130 (1985).

ventilation or kidney dialysis. The Legislature contemplated such heroic measures, which often only prolong the inevitable cessation of life, when it adopted the language "[l]ife–sustaining procedure" in the Natural Death Act.

The argument that artificial nutrition and hydration are withholdable because they are more intrusive than other forms of ordinary feeding is without merit. The most basic forms of patient care, such as ordinary bottle feeding and spoon feeding or catheterization, involve forced bodily intrusion to a degree sufficient to implicate a person's privacy interests. Because such treatment is necessary to maintain patient comfort, however, it is considered basic care. Artificial nutrition and hydration are objectively no different. Both forms of treatment involve forced bodily intrusion sufficient to implicate a privacy interest, and both are necessary to maintain patient comfort. Any attempt to differentiate artificial nutrition and hydration from other forms of basic care is based on emotion and confuses form with substance.

The Natural Death Act's evident concern for patient comfort further supports my belief that nutrition and hydration are not withholdable. The Natural Death Act expressly excludes the "administration of medication . . . necessary to alleviate pain." RCW 70.122.020(4). The text of the act, therefore, suggests that the Legislature did not sanction the removal of nutrition and hydration, which would inevitably cause pain.[20]

Legislative concern that terminally ill patients forgo pain or prolonged death is congruent with the philosophy of euthanasia. *Webster's Third New International Dictionary* (1963), at 786, defines euthanasia as, "the act or practice of painlessly putting to death persons suffering from incurable conditions or diseases". But bringing about a premature

---

[20]Justice Lynch, in his dissent in part from the majority in *Brophy v. New England Sinai Hosp., Inc.,* 398 Mass. 417, 497 N.E.2d 626 (1986) recounted the particularly gruesome effects of death by starvation and dehydration.

death by starvation and dehydration is profoundly incon-
sistent with even the philosophy of euthanasia. It would be
less painful and, therefore, more humane, to administer
lethal injection, an action which the Natural Death Act
certainly does not condone.

The argument that the removal of nutrition and hydra-
tion is humane because incompetents have no sensation is
equally unconvincing. If the patient cannot feel pain or
contemplate death, then the purpose of terminating treat-
ment to afford a death with dignity disappears. Such a
patient will experience neither the indignity of a prolonged
death caused by an unimpeded illness, nor the pain of a
death caused by starvation and dehydration. If, however,
an incompetent person maintains any awareness at all, then
the manner of death does become a subject of concern. The
Natural Death Act's exclusion of "medication . . . neces-
sary to alleviate pain" suggests that the Legislature recog-
nized an ever–present possibility that the patient might not
be completely insensate. RCW 70.122.020(4). Nancy Cru-
zan, for example, was "oblivious to her environment except
for reflexive responses to sound and perhaps painful stim-
uli" and her "highest cognitive brain function [was] exhib-
ited by her grimacing . . . indicating the experience of pain
. . .." 110 S. Ct. at 2845 n.1. Patients in such degenerated
states will not be aware of lofty concepts such as dignity or
the passage of time, but they will be aware of pain. Thus,
for the barely sentient patient, a painless if lengthier death
by an unimpeded illness is more merciful than a short but
painful death by starvation.

Where a persistently vegetative patient is indeed com-
pletely insensate, this entire debate concerns not the feel-
ings of the terminally ill and incompetent, but the feelings
of family and friends of the unfortunate patient. I sympa-
thize with the feelings of loved ones. I recognize that the
pain of watching a loved one degenerate to a less than
human state can be unbearable. I am certain that the cost
of care can be financially crippling. Although the Legisla-
ture must have recognized the plight of loved ones, it did

not enact the Natural Death Act so that loved ones could construe their own self–interest, rationalizing their actions as "in the patient's best interest," and then impose this will on the helpless invalid. Because such an interpretation of the Natural Death Act offends the senses, risking error and inviting abuse, I reject the majority's gloss.

Rather than charging off on an emotional crusade for the right to die, we should follow the United States Supreme Court's rationale in *Cruzan* and defer to the Legislature. First, legislative action will inevitably be more attuned to public opinion than any decision the judiciary could make. Secondly, that the Legislature has defeated every attempt to modify the Natural Death Act and establish nutrition and hydration as "life–sustaining treatment," signals the Legislature's intent that these basic forms of treatment do not fall within the Natural Death Act.[21] Finally, the Legislature is currently addressing the issue. Initiative 119, currently before the Legislature, specifically allows "position assisted suicide," which proposes medically assisted euthanasia for terminally ill patients. The failure of the Legislature to enact a law congruent with the ethical views of this court does not license us to venture into judicial policymaking and ultimately preempt the legitimate exercise of legislative authority.

CONCLUSION

In *In re Colyer, supra,* the court affirmed the right to refuse extraordinary medical treatment in Washington State. *Hamlin* extended the right to incompetent persons

---

[21]*See* House Bill 2465, 51st Legislature, Legislative Digest 664 (1990); House Bill 2681, 51st Legislature, Legislative Digest 733 (1990); House Bill 3005, 51st Legislature, Legislative Digest 826 (1990); Senate Bill 5628, 51st Legislature, Legislative Digest 297 (1989); Substitute Senate Bill 5401, 50th Legislature, Legislative Digest 202 (1987); House Bill 582, 50th Legislature, Legislative Digest 280 (1987); House Bill 1965, 50th Legislature, Legislative Digest 867 (1988); House Bill 206, 49th Legislature, Legislative Digest 93 (1985); Substitute Senate Bill 3228, 49th Legislature, Legislative Digest 94 (1985); House Bill 319, 47th Legislature, Legislative Digest 181 (1981); House Bill 1497, 46th Legislature, Legislative Digest 1300 (1979).

and *Grant* limited this right to the withdrawal of extraordinary care which did not include nutrition and hydration. *In re Colyer,* 99 Wn.2d 114, 660 P.2d 738 (1983); *In re Hamlin,* 102 Wn.2d 810, 689 P.2d 1372 (1984); *In re Grant,* 109 Wn.2d 545, 747 P.2d 445, 757 P.2d 534 (1987). Today the majority redefines "life-sustaining treatment" and its definition directly contradicts our decision in *Grant.* The court's action not only violates the doctrine of stare decisis, it also entangles the court in a web of complex philosophical issues. The United States Supreme Court, in *Cruzan,* questioned whether a federally protected right to forgo nutrition and hydration existed. The *Cruzan* Court confronted the same philosophical issues that we face today and wisely recognized and deferred to the Legislature's superior policymaking abilities. As was the case in *Cruzan,* our Legislature is far better equipped to evaluate this complex issue and should not have its power usurped by this court.

I dissent.